UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

**FILED**

DEC - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

GEORGE MAY,
*POB 3224 Gardens, FL. 33420*
*Palm Beach*
     PLAINTIFF,
*305.508.5011*
          v.

THE STATE OF FLORIDA, CHARLIE
CRIST, INDIVIDUALLY, KAREN
MARJORIE MILLER, INDIVIDUALLY,
WILLIAM LOY ROBY, INDIVIDUALLY,
ROBERT RUSSELL MAKEMSON,
INDIVIDUALLY, LAWRENCE STEVEN
SCHACK, INDIVIDUALLY, BENJAMIN
L. BRYAN, III, INDIVIDUALLY,
ROBERT ANTHONY HAWLEY, JR.,
INDIVIDUALLY, JAMES HALL SEALS,
INDIVIDUALLY, JOHN SCOTT CARLIN,
INDIVIDUALLY, JOINTLY, AND
SEVERALLY,

          DEFENDANT'S,

_____

)
)
)
)
)
)
)
)
)

NO._____

Case: 1:07-cv-02203
Assigned To : Collyer, Rosemary M.
Assign. Date : 12/6/2007
Description: Pro Se General Civil

)
)
)
)
)
)
)
)
)
)

### COMPLAINT

COMES NOW PLAINTIFF, George May, and does hereby file this his complaint, complaint for injunction against the defendant's the State of Florida, Charlie Crist, Individually, Karen Marjorie Miller, Individually, William Loy Roby, Individually, Robert Russell Makemson, Individually, Lawrence Steven Schack, Individually, Benjamin L Bryan, III, Individually, Robert Anthony Hawley, Jr., Individually, James Hall Seals, Individually, John Scott Carlin Individually, jointly and severally, for the violation, deprivation of his First, Fourth, Fifth, Fourteenth, Amendment of the United States of America Constitution Rights, his Civil Rights, 42 U.S.C. § 1983, Liberty, Due Process Rights, by a "transparently" unlawful invalid decree, unconstitutional on it's face, patently unconstitutional as applied Order, Order

by Charlie Crist, paid by Isle of Capri Casino's, Pompano Park

Racing and Poker, and as grounds therefore demands damages and

injunction against the State of Florida, Charlie Crist,

Individually, Karen Marjorie Miller, Individually, William

Loy Roby, Individually, Robert Russell Makemson, Individually,

Lawrence Steven Schack, Individually, Benjamin L. Bryan, III,

Individually, Robert Anthony Hawley, Jr., Individually, James

Hall Seals, Individually, John Scott Carlin, Individually,

jointly and severally, for cause herein as follows:

1. The plaintiff, George May, is a natural born citizen of

the United States of America, a resident of the State of Florida,

domiciled in Florida.

2. The defendant the State of Florida is a political

subdivision of the United States of America.

3. The defendant Charlie Crist is the Government of Florida

unless he has been removed by the Federal Bureau of Investigation

for Appraisal Fraud, Mortgage Fraud, Honest Services Fraud, I.R.S.

Fraud, Money Laundering, Rigging Casino Gambling Licenses, the

Courts, Judgements, Orders, Orders by Judges against George May,

for the Isle of Capri Casino's, Pompano Park Racing and Poker.

residing in Miami, Florida, dcmiciled in Miami, Florida.

4. The defendant Karen Marjorie Miller, is a Circuit Court

Judge in West Palm Beach, resident of West Palm Beach, domiciled

in West Palm Beach, Florida unless removed for the same reasons

as Charlie Crist.

5. The defendant William Loy Roby, is a Circuit Court Judge

in Martin County, Florida, resident of Martin County, domiciled

in Martin County, Florida unless removed for the same reasons

-2-

as Charlie Crist.

6. The defendant Robert Russell Makemson, is a Circuit Court judge in Martin County, Florida, resident of Martin County, domiciled in Martin County, Florida unless removed for the same reason as Charlie Crist.

7. The defendant, Lawrence Steven Schack, is a Circuit Court judge in Martin County, Florida, resident of Martin County, domiciled in Martin County, Florida unless removed for the same reason as Charlie Crist.

8. The defendant Benjamin L. Bryan, III, is a Circuit Court judge in St. Lucie County, Florida, resident of St. Lucie County, domiciled in St. Lucie County, Florida unless removed for the same reason as Charlie Crist.

9. The defendant, Robert Anthony Hawley, Jr., is a Circuit Court judge in Indian River County, Florida, resident of Indian River County, domiciled in Indian River County, Florida unless removed for the same reason as Charlie Crist.

10. The defendant, James Hall seals, is a Circuit Court Judge in Lee County, Florida, resident of Lee County, domiciled in Lee County, Florida unless removed for the same reason as Charlie Crist.

11. The defendant, John Scott Carlin, is a Circuit Court judge in Lee County, Florida, resident of Lee County, domiciled in Lee County, Florida, unless removed for the same reason as Charlie Crist.

12. The amount in controversy in this matter exceeds $75,000.00 bringing it within the purview of this honorable Court.

-3-

JURISDICTION

13. The plaintiff, George May, here realleges, and reaffirms his allegations in 1. through 13., and incorporates them herein.

14. This honorable court has jurisdiction over this matter under the First, Fourth Fifth, Fourteenth, Amendment of the United States of America Constitution, the Civil Rights Act, 42 U.S.C. § 1983, the Due Process Clause, the Bill of Rights.

STATEMENT OF THE CASE
COUNT I

15. The plaintiff, George May, here realleges, and reaffirms his allegations in 1. through 15., and incorporates them herein.

16. The defendant, Charlie Crist, Individually who is, was, paid by the Isle of Capri Casino's, Pompano Park Racing and Poker. Ordered, the before named defendant judges to enter "transparently" unconstitutional, unconstitutional as applied, void, without subject matter jurisdiction, invalid, in clear absence of all authority orders against George May, in plaintiff, George May, contract to purchase complaints against the sellers of property to George May, who refused to perform their contracts, refused to provide provide evidence of title in their name, refused to provide a Certified Survey, by a Florida Licensed, Registered Surveyor, signed in blue ink, with a raised embossed seal, with a Survey's affidavit to provide title insurance, financing for the property being sold to George may. The sellers of the property in George May, contract to purchase complaints, also committed "identity" of Title Fraud by selling property that they did not own, oil, gas, mineral rights, that they did not own, and signed written, corroborated confessions admitting their guilt by signing

-4-

their contracts for sale to George May. The sellers in the contract to purchase complaints filed by plaintiff, George May, then had their attorney's file false, fraudulent, forged court papers, that require treble damages of the amount of the contract in each case to be awarded to George May, under Florida, Federal Statutes, attached here is plaintiff, George May, Addendum "A".

17. The use of the "transparently", unconstitutional, invalid, unlawful, unconstitutional as applied "DEVICE", Scheme, Order, Order by Charlie Crist to the Judges, Order against George May, by Charlie Crist payed by Isle of Capri casino's, Pompano Park Racing and Poker invidiously discriminates against plaintiff, George May, violates, deprives plaintiff, George May of his First, Fourth, Fifth, Fourteenth Amendment to the United States of America Constitution Rights, his Civil Rights 42 U.S.C. § 1983, his Due Process Rights, his Contract Rights, Treaty Rights, Right to Liberty, Right to Buy Property, Access the Courts, Right to use of the Courts to enforce his contract rights, right to Business in Interstate Commerce, Rights to his damages against the sellers of property to George May, for their refusal to perform their contracts, fraud, deceit, bad faith, "identity" of title fraud, fraud, deceit, bad faith before mentioned herein.

18. The before mentioned criminal acts, unlawful acts by the defendant's here against plaintiff, George May were intentionally done to deprive, violate plaintiff, George May, Liberty, Civil Rights 42 U.S.C. § 1983, Due Process Rights, to rob, destroy plaintiff, George May, and his Real estate Development Business, for their payments received from the Isle of Capri Casino's, Pompano Park Racing and Poker.

-5-

19. The defendant judges here, attached is plaintiff, George May, Addendum "A", orders, judgements in all of the plaintiff, George May, contract to purchase complaints, entered "transparently", unlawful, invalid, unconstitutional, void, without subject matter jurisdiction, unconstitutional as applied orders, judgements against plaintiff, George May, as they do not have attached to their orders, judgements, required Certified Survey's by a Florida Licensed, Registered Surveyor, Signed in Blue Ink, with a Raised Embossed Seal, with a Notorized Surveyors Affidavit attached to their orders. A judge is not a Florida Licensed, Registered Surveyor.

20. The defendant's named herein have denied plaintiff, George May, Equal protection of the law and have invidiously discriminated against plaintiff, George May, because of his race. The defendant's here are engaged in RICO Acts by participating in a "Scheme" to evade I.R.S. tax, United States v. Frumento, 563 F.2d 1083 (3rd Cir. 1977). The defendant's here have deprived, violated the plaintiff, George May, protected Due Process Rights, of the First, Fourth, Fifth, Fourteenth Amendment of the United States of America Constitution, his Civil Rights 42 U.S.C. § 1983, Cohns v. Virginia, 19 U.S. (6 Wheat), 264, 404, 5 L. ed. 257 (1821), by not obeying their "Oath" contract.

21. The defendant's here have denied plaintiff, George May, Equal Protection of the law and have invidiously discriminated against plaintiff, George May, because their taking payment for self profit, payoffs, from the Isle of Capri Casino's, Pompano Park Racing and Poker, attached here is plaintiff, George May, Addendum "B".

-6-

22. The defendant's here are committing treason against the
United States of America by use of. Order by Charlie Crist that
is unconstitutional, unconstitutional as applied, invalid, void,
without subject matter jurisdiction, for the purpose of taking
plaintiff, George May, Liberty, Constitutional Rights, Civil
Rights before mentioned herein without Due Process of Law,
required by the Due Process Clause of the First, Fourth, Fifth,
Fourteenth Amendment of the United States of America Constitution.
Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958); U.S. v.
Will, 449 U.S. 200, 216, 101 S. Ct. 471.

23. The defendant's here have deprived, violated plaintiff,
George May, of his protected due process rights by taking his
property without due process of law required by the First, Fourth,
Fifth, Fourteenth Amendment of the United States of America
Constitution by setting up their own "DICTATORSHIP" within the
United States of America, by their enforcing their "transparently"
unlawful, invalid, unconstitutional, unconstitutional as applied
Orders, Charlie Crist Order, their unconstitutional,
unconstitutional as applied, invalid, without subject matter
jurisdiction Order, against plaintiff, George May, their Florida
Constitutional 4, Article X, SECTION 19, SLOT MACHINES, for their
purpose of self profit, payments from Isle of Capri Casinos,
Pompano Park Race Racing and Poker, for the purpose of I.R.S.
Fraud, Racketeering, Money Laundering, "punitive" tax to
themselves by using a agency as a "DEVICE", Conduit, deprivation,
of Treaty Rights, unequal administration of Treaty's of the
United States, unjust and illegal discrimination between George
May, and persons in similar circumstances, as Henry Flagler,

-7-

Hard Rock founder Peter Morton.

24. The plaintiff, George May, is suing these defendant's as individuals which are part of a conspiracy committing criminal acts, against the plaintiff, George May, in their individual capacity, for their actions clearly beyond the powers of their official positions as state of Florida employees.

25. The plaintiff, George May, complaint here seeks to prohibit the continued violation, deprivation of plaintiff, George May, Due Process Rights, Civil Rights 42 U.S.C. § 1983, Due Process Provisions of the First, Fourth, Fifth, Fourteenth Amendment United States of America Constitution, by the defendant's here for their self profit, Honest Services Fraud, I.R.S. Fraud, Money Laundering. Exparte Young Supra; Scheuer v. Rhodes 388 U.S. 307, 315.

26. A Court, does not have jurisdiction to do what a city or other agency of a state, state lacks jurisdiction to do. The command of the Fourteenth Amendment through the First, Fourth, Fifth Amendment is made applicable to the States, is that no "State" shall deprive any person of "liberty" without due process of law. The decree of the State Court is "state" action in the constitutional sense (Shelly v. Kraemer, 334 U.S. 1, 14-18), as much as the action of the state police, the state prosecuter, the state legislature, or the Governor himself. The Orders, Order by Charlie Crist against plaintiff, George May, for Charlie Crists payment received by the Isle of Capri Casino, Pompano Park, Racing and Poker mentioned herein are "transparently" invalid, unconstitutional on their face, unconstitutional as applied, attached here is plaintiff, George May, Addendum "B".

-8-

27. The defendant's here are committing their criminal acts against the plaintiff, George May, as individuals and have no immunity of any kind for their "transparently" invalid, void, unconstitutional on their face, unconstitutional as applied Orders, Orders by Charlie Crist against plaintiff, George May, that deprive, violate his Fourteenth Amendment Rights through the First, Fourth, Fifth, Amendment of the United States of America Constitution, his Due Process Rights, his Civil Rights, 42 U.S.C. § 1983. Walker v. City of Birmingham, 388 U.S. 307, 315, (1967); Exparte Young Supra;, Scheuer v. Rhodes, 94 S. Ct. 1683 , for their self profit, payment from Isle of Capri, Casino's, Pompano Park Racing and Poker.

28. This action here by plaintiff, George May, seeks to enjoin the unconstitutional exercise, deprivation, violation of plaintiff, George May, rights, privileges, and immunities under the United States of America Constitution, as Amended, the Takings, Equal Protection and Due Process Clauses in the First, Fourth, Fifth, Fourteenth Amendment of the United States of America Constitution by defendant's here for their self profit, payment from Isle of Capri Casino's, Pompano Park Racing and Poker.

WHEREFORE, plaintiff, George May, demands damages for the violation, deprivation of his Civil Rights, 42 U.S.C. § 1983, his Fourteenth Amendment through the First, Fourth, Fifth, Amendment of the United States of America Constitution, his Due Process Rights in the First, Fourth, Fifth, Fourteenth Amendment of the United States of America Constitution, against the defendant's, the State of Florida, Charlie Crist, individually, Karen Marjorie Miller, individually, William Loy Roby, individually, Robert Russell Makemson, individually, Lawrence Steven Schack, individually, benjamin L. Bryan, III, individually, Robert Anthony Hawley, Jr., individually, James Hall Seals, individually, John Scott Carlin, individually, jointly and severally, an Order enjoining the State of Florida from enforcing the Order's to the Judges, Orders by Charlie Crist to deprive plaintiff, George May, of his Constitutional Rights before mentioned for his self profit, payment from the Isle of Capri Casino's, Pompano Park Racing and Poker, and an Order enjoining the before mentioned judges from not performing their required administrative duty of entering default, summary judgement for plaintiff, George May, and against the defendant's, here is plaintiff, George May, Addendum "A", for treble the amount of George May Purchase contracts, requested in George May complaints, and against the defendant's, sua sponte, forthwith.

Respectfully submitted

George may
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph. 305-508-5011

-10-

PLAINTIFF, GEORGE MAY

ADDENDUM

"A"

2-8-07

To: Honorable Judges
    Robert R. Makemson,
    William L. Roby,
    Larry Schack,
    Benjamin L. Bryan
    James Hall Seals
    Scott Carlin,
    Robert A. Hawley
    Karen M. Miller

P.O. Box 746
Stuart, Fl. 34995-0746
Ph. 772-288-5570
Fax 772-288-5572

Kathi Cashwell, Manager
Clerk of the Circuit Court
100 East Ocean Blvd.
Stuart Fl. 34994
Ph. 772-288-5977
Fax 772-221-1356

The sellers/signers of all of these contracts for sale.
properties committed Identity of Title Fraud, as they
signed the contracts with knowledge that they were
selling rights that they do/did not own, by refusing to
provide a required Certified Survey by a Registered
Licensed Florida Surveyor signed in Blue Ink with a raised
embossed seal, and Surveyors Affidavit for Evidence of
their Title in Their Name as represented for the required
ALTA Title Policy to be issued for financing, closing.

Failure of all Judges to reverse their Orders, and find
Treble Damages of the amount of the contract for George May
and his joint Venture Partners is Honest Services Fraud,
by the Judge, by Elliot's Stone, U.S. Code Collection §455.

Please immediately reverse all of your Orders entered in
error against George May, Order Treble Damages of the
Amount of the Contract in these enclosed cases against the
Sellers, Owners in Possession, and for George May, or have
their attorneys issue the orders as required by F.S. §38.13.

Please also Order that all deposits of $2,500.00, each
enclosed be refunded, returned to George May, for the
same fact's, reasons, exparte, sua sponte, forthwith.

Thank you for your help.

P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph. 305-508-5011

Sincerely

George May

07 2203

**FILED**

DEC - 6 2007

6-13-05


To: The Clerk of the Circuit Court
Martin County Courthouse
100 East Ocean Blvd.
Stuart, Fl. 34994



Re: My money held in
Trust by you


Dear Clerk,


Please provide to me an accounting of the approximately
$26,000.00, held by you of my money, under various
case numbers under the Unconstitutional, void, Florida
Statutes Chapter §57.105, §68.093, prohibited by Article
VI, U.S. Constitution, federal Statutes 28 U.S.C.A.
§1915(d).

Please also send to me the total amount held by you plus
interest.

Thank you for your help.

Yours Truly

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420



6-13-05

To: The Clerk of the Circuit Court
    Martin County Courthouse
    100 East Ocean Blvd.
    Stuart, Fl. 34994

Re: My money held in
    Trust by you

Dear Clerk,

Please provide to me an accounting of the approximately
$26,000.00, held by you of my money, under various
case numbers under the Unconstitutional, void, Florida
Statutes Chapter §57.105, §68.093, prohibited by Article
VI, U.S. Constitution, federal Statutes 28 U.S.C.A.
§1915(d).

Please also send to me the total amount held by you plus
interest.

Thank you for your help.

                            Yours Truly

                            George May
                            P.O. Box 32247
                            Palm Bch. Gardens
                            Fl. 33420

anywhere. Should the property be sold, the previous owner is still the legal owner of the property, no matter whose name is on the title.

Nor does this apply only to the previous owner. When purchasing property, the purchaser is required to inspect the entire record of the property and of each and every previous judicial case in which the property was involved. In the event that any officer of the court in any previous judicial hearing engaged in "fraud upon the court", or in which the judge engaged in any act which he had no authority to engage in, whether by law or by statute, the owner of the house or property at that previous time remains the legal owner of the house.

In fact, a good case can be made that each and every person who appeared on that property without the true owner's express permission, has engaged in criminal trespass. And each of them may be subject to a claim for damages.

Courts have stated that:

As one example, under Illinois law, during a divorce action, a court has no power to determine property rights since such can be based only upon a valid divorce decree. Should any property be ordered sold by a judge prior the granting of a valid divorce, the judge has engaged in an action beyond which he has any authority. Should the property be sold, the party who lawfully owned the property prior to the court's order, remains the true owner of the property.

And it is the purchaser of the property who has the legal burden to establish that the judge issued a valid divorce decree.

Citizens further suggests that, in any divorce action in which property is ordered to be sold prior to the granting of a valid divorce decree, the judge has acted without lawful authority and the divorce decree, even if issued later, is not a valid divorce decree.

Courts have also stated that a purchaser of property is not entitled to rely on a judicial proceeding the record of which evinces a lack of jurisdiction.

It is a rule of law that a purchaser, whether he be a party to the record or a stranger, and all subsequent titleholders are chargeable with notice of the condition of the record and are not protected from the consequences of purchasing under a void judgment or decree.

Courts have held that any party, as purchaser at an execution sale, is presumed to be cognizant of every fact pertaining to the status of the judgment.

The general rule is that an execution may not issue upon a void judgment; an execution so issued is itself absolutely void, and such invalidity extends to acts performed thereunder. Accordingly, title does not pass to a purchaser at an execution sale, where the judgment supporting it is void.

| NAME, ADDRESS, CASE NO. | PROPERTY | ATTORNEY, ADDRESS |
|---|---|---|
| Bedner Farm, Inc. et. al.<br><br>CASE NO. 562004-CA-001232<br><br>St. Lucie County<br><br>04-00529 CA ✓ | Contract, Approx. 197 Ac.<br><br>St. Lucie County, | Mark A. Perry, Esq. 50 SE Fourth Ave. Delray Bch. Fl. 33483<br><br>H. Michael Easley, Esq. 505 S. Flagler Dr. Suite 1100 West Palm Bch., Fl. 33401-3475 |
| Cleo Stern, Individually, and Cleo Stern, as Trustee, jointly, and severally,<br><br>CASE NO. 04-528-CA ✓ Martin County, | Contract,<br><br>Approx. 27 Ac.<br><br>St. Lucie County | J. Stephen Tierney, III, Esq. P.O. Box 1270 Fort Pierce, Fl. 34954 |
| THE LATT MAXCY CORPORATION, a Florida Corporation,<br><br>CASE NO. 20040710-CA-03<br><br>Indian River County | Contract,<br><br>Approx.<br><br>3,000 Ac.<br><br>Indian River County | William C. Guerrant, Jr. Esq. P.O. Box 2231 Tampa, Fl. 33601-2231 |
| John D. Martino, Individually, and as Trustee of the John D. Martino Family Irrevocable Gift Giving Trust u/a/d 12/27/90<br><br>CASE No. 502003CA010424 XXCDAA<br><br>Palm Beach County | Contract, Approx. 10 Ac. | David S. Pressly, Esq. 222 Lakeview Ave. Ste. 910 West Palm Bch. Fl. 33401 |

| NAME, ADDRESS, CASE NO. | PROPERTY | ATTORNEY, ADDRESS |
|---|---|---|
| 714 GROUP, L.C.<br><br>CASE NO. 02-715-CA<br> 03-61-CA<br> 04-528-CA<br> 04-675-CA<br>Martin County<br>_04-329 CA_ ✓ | Contract,<br>Approx.<br>105 Ac.<br><br>Martin County | Michael S. Orfinger, Esq.<br>125 S. Palmetto Ave.<br>Daytona Bch, Fl. 32114 |
| Turner Groves Limited Partnership,<br><br>CASE NO. 04-35-CA ✓<br>Martin County<br>_04-00674-CA_ | Contract,<br><br>Approx.<br>1,746 Ac.<br>Martin County | James Edward Cheek, III, Esq.<br>P.O. Box 880.<br>Winter Park, Fl. 32789 |
| Allapattah Properties Partnership, Martin County, and South Florida Water Management District,<br><br>CASE NO. 04-675 CA ✓<br> 03-551 CA ✓<br>Martin County | Contract,<br><br>Approx.<br><br>22,656 Ac.<br>Martin County | Richard V. Neil, Esq.<br>P.O. Box 1270<br>Fort Pierce,<br>Fl. 34954<br><br>David Action, Esq.<br>2401 S.E. Monterey Rd.<br>Stuart, Fl. 34996 |
| Curtis, et. al.<br>CASE NO. Martin County<br>_04-00146 CA_ ✓<br>Martin County | Contract,<br><br>Approx. 57 Ac.<br><br>Martin County | Charlie Crist, Esq.<br>The Capitol,<br>Tallahasse, Fl. 32399<br><br>✓ |
| Friedman,<br>CASE NO. Martin County<br>_04-00328 CA_ ✓ | Contract,<br><br>Approx. 31 Ac.<br>Martin County | Charlie Crist, Esq.<br>The Capitol<br>Tallahassee, Fl. 32399<br><br>✓ |
| Palm City 95,<br><br>CASE NO. Martin County<br>_04-00327 CA_ ✓ | Contract,<br><br>Approx. 250 Ac.<br>Martin County, | Charlie Crist, Esq.<br>The Capitol<br>Tallahassee, Fl. 32399<br><br>✓ |

| | | |
|---|---|---|
| Steve Bacardi, Individually, et. al.<br><br>CASE NO. 05-78CA<br>LEE COUNTY | Contract, Approx. 27 Ac.<br><br>Ft. Myers | Anthony M. Lawhon, Esq.<br>3431 Pine Ridge Rd.<br>Suite 101<br>Naples, Fl. 33831 ✗<br><br>Diane E. McGill, Esq.<br>P.O. Box 2696<br>Bartow, Fl. 33831 ✓ |
| Jack S. Collins, and Dorthy J. Collins, his wife, jointly, and severally,<br><br>CASE NO. 2004 CA 2962<br>CITRUS COUNTY | Contract, Approx. 105 Ac.<br><br>Citrus County | Shirn M. Vessly, Esq.<br>P.O. Box 57<br>St. Petersburg,<br>Fl. 33731 ✗ |
| Averk<br><br>CASE NO. Dade County | Contract,<br><br>Approx. 10 Ac.<br>Across from Casino<br><br>Dade County | Charlie Crist, Esq.<br>The Capitol<br>Tallahassee, Fl. 32399 |
| Rachel Woolin, as personal Representative of the Estate of Martin Woolin,<br>DADE COUNTY<br>CASE NO. 50 2002 CA 011037 AJ | Contract,<br><br>Approx. 153 Ac<br>Dade County. | Brian Hersh, Esq.<br>19 W. Flagler St.<br>Suite 602<br>Miami, Fl. 33130 ✓ |



02/06/2007  11:08    7722886714                    MC CCC ACCOUNTING              PAGE  04/07
020607                Martin County Clerk of Circuit Court                       Page 1
                          Subsidiary Ledgers COURT FUNDS

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

CF 04 00328 CA MAY GEORGE VS FREEDM                                              2,500.00

| TRANSDTE | DOCUMNT | TYPE | - DETAIL TRANSACTION DESCRIPTIONS - | -TRANS AMOUNT- |
|----------|---------|------|-------------------------------------|----------------|
| 04 26 04 | 4004954 | RECT | MAY GEORGE                          | 2,500.00+      |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |
| 00 00 00 |         |      |                                     | .00            |

*31 AC C.R. 714*

*Now INMAN*
*Devolopment INC.*
*MARTiN CoUNTY*
*ChARlio CRiSt*
*SoRVod DoFAUlt*
*by SELLoR*

FRIEDMAN





HOME | REMOTE ACCESS | US-MAPS | LINKS | LEGAL NOTICE | ACQUISITIONS | AVAILABLE LAND

**PROPERTY INFORMATION**

**PRELIMINARY SITE PLAN FOR 10 COMMERCIAL LOTS**



**ARIEL PHOTO     SCRIPPS >>**

**ZONING MAP     NEW DEV.**

**SITE PLAN     PRINTABLE INFORMATION**

31 40 ACRE PROPERTY

FOR MORE INFORMATION CALL  DAN INMAN  561-644-6620

© Copyright 2000 Inman Development Company, LLC. All Rights reserved For information about this site info@inmandevelopment.com

11/12/2006 06:19 p.m.

02/06/2007  11:08    7722885714                                    PAGE  03/07

020607                                          MC CCC ACCOUNTING
                       Martin County Clerk of Circuit Court          Page 1
                            Subsidiary Ledgers COURT FUNDS

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

CF 04 00327 CA MAY GEORGE VS NORFIE                                    2,500.00


   TRANSDTE    DOCUMNT    TYPE   - DETAIL TRANSACTION DESCRIPTIONS -   -TRANS AMOUNT-
   ========    =======    ====   ======================================   =============

   04 26 04   4004947    RECT   MAY GEORGE                               2,500.00+
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00
   00 00 00                                                                   .00

_250 Ac C.R. 714
Martin County
now McGill
Property Group
Charlie Crist
served Default
by Seller_



Nortfield

MARTIN HWY (SR 714)

**PROJECT DATA**

| | |
|---|---|
| **HIGHWAY COMMERCIAL** | **36 ACRES** |
| **RESIDENTIAL DEVELOPMENT** | **183 ACRES** |
| **CONSERVATION AREA** | **31 ACRES** |
| **TOTAL** | **250 ACRES** |

02/06/2007  11:08  7722885714

020607

MC CCC ACCOUNTING
Martin County Clerk of Circuit Court
Subsidiary Ledgers REGISTRY

PAGE 06/07
Page 1

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

RG 04 00674 CA G.MAY VS TURNER GROV                                    2,500.00

| TRANSDTE | DOCUMNT | TYPE | - DETAIL TRANSACTION DESCRIPTIONS - | -TRANS AMOUNT- |
|----------|---------|------|--------------------------------------|----------------|
| 08 31 04 | 4010176 | RECT | GEORGE MAY | 2,500.00+ |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |
| 00 00 00 | | | | .00 |

*1756 Ac. CR 714*

*MARTIN County*

020607              Martin County Clerk of Circuit Court                                Page 1
                         Subsidiary Ledgers COURT FUNDS

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

CF 04 00035 CA MAY GEORGE VS TURNER                                          2,500.0000
000000000000

TRANSDTE   DOCUMNT   TYPE   - DETAIL TRANSACTION DESCRIPTIONS -   -TRANS AMOUNT-
========   =======   ====   ===============================   ==============

01 15 04   4000496   RECT   MAY GEORGE                             2,500.00+
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00
00 00 00                                                               .00

*1,756 Ae, C.R. 714*
*MARtiN couNty*

04-329-CA

IN THE CIRCUIT COURT, NINETEENTH
JUDICIAL CIRCUIT, IN AND FOR
MARTIN COUNTY, FLORIDA

CASE NO.:    04-329-CA

**GEORGE MAY,**

Plaintiff,

vs.

**714 GROUP, L.C.,**
a Florida limited liability company,

Defendant.

_____/

INSTR # 1951569
OR BK 02168 PG 0822
Pgs 0822 - 8317 (10pgs)
RECORDED 08/03/2006 09:30:00 AM
MARSHA EWING
CLERK OF MARTIN COUNTY FLORIDA
RECORDED BY C Burkey

FILED FOR RECORD
MARTIN COUNTY, FL
Date 7/28/06 Time 11:00
MARSHA EWING
CLERK OF CIRCUIT COURT
By _____ D.C.

### FINAL JUDGMENT TAXING ATTORNEYS' FEES AND COSTS AND DIRECTING FORFEITURE OF BOND

THIS CAUSE came before the Court upon Defendant, 714 GROUP, L.C.'s, Motion to Tax Attorneys' Fees and Costs and for Forfeiture of Bond. The Court has heard the testimony of witnesses, received documents in evidence, heard the argument of counsel, reviewed the Motion, the court file, and is otherwise duly advised in the premises. Accordingly, the Court hereby FINDS AS FOLLOWS:

A.    Defendant, 714 GROUP, L.C., is the prevailing party in this action. As such, Defendant is entitled to recover its taxable costs. Further, pursuant to the contract that is the subject of this action, Defendant is entitled to recover its reasonable attorney's fees incurred in the defense of this action.

B.    The Court finds that the expenditure of 16.7 hours by Defendant's counsel is reasonable.

105 AC I-95
+CR 714

C.    The Court finds that $185.00 per hour for the services of Defendant's counsel is adequate and reasonable, and that therefore, an attorney's fee of $ 3,069.50 is reasonable.

D.    The Court finds that Defendant is entitled to recover taxable costs in the amount of $50.00.

E.    In addition to the aforesaid taxable costs, Defendant is entitled to recover expert witness fees for the services of James M. Munsey, Esq. The Court finds Mr. Munsey's hourly rate of $200.00 to be adequate and reasonable, and further finds his expenditure of 1.66 hours in this matter to be adequate and reasonable.

F.    At the time Plaintiff GEORGE MAY filed this action, he posted a cash bond with the Clerk of this Court in the amount of $2,500.00, as required by that certain Order entered on February 3, 2003 in the civil action styled George May v. Allapattah Properties Partnership, et al., Case No. 02-904-CA, in the Circuit Court of the Nineteenth Judicial Circuit, in and for Martin County, Florida ("the Pre-Filing Order").

G.    The Pre-Filing Order provides for the forfeiture of said cash bond upon the dismissal of this action. Because this action has been dismissed with prejudice, Plaintiff's cash bond should be forfeited to cover a portion of the attorney's fees and costs Defendant has incurred in the defense of this action.

Accordingly, it is hereby ORDERED AND ADJUDGED as follows:

1.    Defendant 714 GROUP, L.C., whose address is 42 S. Peninsula Drive, Daytona Beach, FL 32118, shall have judgment against Plaintiff,

2

GEORGE MAY, whose address is P.O. Box 32247, Palm Beach Gardens, FL 33420, for $ 3,089.50 in reasonable attorneys' fees, $ 333.33 for expert witness fees, and $50.00 for taxable costs, making a total of $ 3,523.33 that shall bear interest at 9.0% per annum, FOR ALL OF WHICH LET EXECUTION ISSUE.

2.    The Clerk of this Court is ordered to immediately and forthwith pay to Defendant, 714 GROUP, L.C., the cash bond in the amount of $2,500.00 previously posted by Plaintiff, together with any interest accrued thereon and less any applicable Clerk's fees, in partial payment of this judgment.  Said funds shall be payable to the order of 714 Group, L.C., and delivered to Defendant's attorney, Michael S. Orfinger, Esq., 125 South Palmetto Avenue, Daytona Beach, Florida 32114.

3.    It is further ORDERED AND ADJUDGED that the judgment debtor, GEORGE MAY, shall complete under oath Florida Rule of Civil Procedure Form 1.977 (Fact Information Sheet), including all required attachments, and serve it on the judgment creditor, 714 GROUP, L.C.'s attorney, or the judgment creditor if the judgment creditor is not represented by an attorney, within 45 days from the date of this Final Judgment, unless the Final Judgment is satisfied or post-judgment discovery is stayed.

Jurisdiction of this case is retained to enter further orders that are proper to compel the judgment debtor, GEORGE MAY, to complete Form 1.977, including all required attachments, and serve it on the judgment creditor's

3

attorney, or the judgment creditor if the judgment creditor is not represented by an attorney.

DONE AND ORDERED in Chambers at Stuart, Martin County, Florida, this _28_ day of July, 2006.

_____
Circuit Judge

Copies furnished to:

George May, P.O. Box 32247, Palm Beach Gardens, FL  33420
Michael S. Orfinger, Esq., 125 S. Palmetto Avenue, Daytona Beach, FL  32114

4

020607              Martin County Clerk of Circuit Court              Page 1
                         Subsidiary Ledgers REGISTRY

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

RG 04 00675 CA G.MAY VS ALLAPATTAH                                   2,500.00


  TRANSDTE   DOCUMNT   TYPE  - DETAIL TRANSACTION DESCRIPTIONS -   -TRANS AMOUNT-
  ========   =======   ====  =============================        ==============

  08 31 04   4010177   RECT  GEORGE MAY                               2,500.00+
  00 00 00                                                                  .00
  00 00 00                                                                  .00
  00 00 00                                                                  .00
  00 00 00                                                                  .00
  00 00 00                                                                  .00
  00 00 00                            22,656 Ac CR 714                      .00
  00 00 00                            MARtiN County                        .00
  00 00 00                                                                  .00
  00 00 00                                                                  .00

INSTR # 1807647
OR BK 01974 PG 0567
RECORDED 01/19/2008 02:09:52 PM
MARSHA EWING
CLERK OF MARTIN COUNTY FLORIDA
RECORDED BY C Burkey

IN THE CIRCUIT COURT, 19TH
JUDICIAL CIRCUIT, IN and FOR
MARTIN COUNTY, FLORIDA
CASE NO: 03-551 CA
JUDGE: LARRY SCHACK

GEORGE MAY,

                Plaintiff,

v.

*03-551 CA*

ALLAPATTAH PROPERTIES PARTNERSHIP,
a Florida general partnership, MARTIN
COUNTY, and SOUTH FLORIDA WATER MANAGEMENT
DISTRICT, jointly and severally,

                Defendants.

FILED FOR RECORD
MARTIN COUNTY Fl
Date_____ Time_____
MARSHA EWING
CLERK OF CIRCUIT COURT
By_____

## JUDGMENT FOR ATTORNEYS' FEES AND COSTS

    This cause having come on for hearing before the Court on
the defendant ALLAPATTAH PROPERTIES PARTNERSHIP'S Motion to Tax
Costs and for Allowance of Attorneys' Fees and to Order Payment
of Cash Bond, and the Court having considered the record of this
cause, including the Final Summary Judgment entered herein in
favor of said defendant on September 10, 2003, wherein the Court
granted the defendant's motion for attorneys fees and reserved
jurisdiction to determine the amount thereof; and

    The Court having considered and taking judicial notice of
the Order of the District Court of Appeal, State of Florida,
Fourth District, dated February 4, 2004 awarding attorneys' fees
for services of the defendant Allapattah Properties Partnership's
attorneys in connection with the appeal and further providing

*ONCE Flooded EACH oil*
*GAS MINERAL OWNER CAN*
*SUE S.F.W.M.D. MARTIN*
*COUNTY FAR TAKING LIMESTONE*
*SAND ROCK GRAVEL*

that the amount thereof should be determined by this Court on remand; and

The Court having considered the testimony of counsel for the defendant Allapattah, Richard V. Neill, and having considered the testimony of the expert witness presented by said defendant, E. Clayton Yates, Esquire, and

The Court being cognizant of the requirements of Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985), the Court finds:

1. The Court has jurisdiction of the parties and the subject matter.

2. Counsel for the defendant, Allapattah, reasonably expended 23.5 hours in the proceedings in the trial court.

3. Considering all factors mentioned in Rowe, a reasonable hourly rate for defendant's counsel in the trial court is $350.00 per hour, resulting in a loadstar fee in the amount of $8,225.00 for services in the trial court.

4. Considering all factors set forth in Rowe, there is no basis for increasing or decreasing the loadstar fee.

5. As to the appellate proceedings, the Court finds that counsel for Allapattah reasonably expended 34.45 hours and further finds that an hourly rate for the services of Richard V. Neill of $350.00 per hour is reasonable and an hourly rate of $250.00 per hour is reasonable for the

ONCE Flooded a million of ACRE Foot ton's of WATER PER SECOND UNCONTROLLED to MURDER SCRIPPS, SHOWN A Homes Residents AS NEW ORLEANS

OR BK 01974 PG 0548

2

services of Richard V. Neill, Jr., resulting in a loadstar fee of $11,967.50.

6. Considering all factors mentioned in <u>Rowe,</u> the Court finds no basis for increasing or decreasing the loadstar fee.

7. The defendant, Allapattah, reasonably incurred court reporting expense in the amount of $124.35.

And the Court having previously required the plaintiff, George May, to post a cash bond in the amount of $2,500.00 for the purpose of indemnifying the defendant, Allapattah, in the event that defendant was determined to be entitled to receive attorneys' fees in this action, and the plaintiff, George May, having failed to appear or offer any evidence on the issues before the Court, and the Court being fully advised in the premises, it is

ORDERED AND ADJUGDGED that the defendant, ALLAPATTAH PROPERTIES PARTNERSHIP, have an recover from the plaintiff, GEORGE MAY, the total sum of Twenty Thousand Three Hundred Sixteen Dollars and 05/100 Dollars ($20,~~316.05~~ 306.85) for costs and attorneys' fees, for all of which let execution issue; it is further

ORDERED AND ADJUDGED that the Clerk of this court shall pay the cash bond posted by the plaintiff, George May, in the amount of Two Thousand Five Hundred Dollars ($2,500.00), with any

OR BK 01974 PG 0569

3

interest accrued thereon, to the defendant Allapattah Properties

Partnership in partial satisfaction of this judgment.

DONE and ORDERED in Chambers at Stuart, Martin County,

Florida, this 11 day of Jan ___, 2005.

William L. Roby, Circuit Judge

Copies furnished:
Mr. George May
David Acton, Esq.
Robert Panse, Esq.
Richard V. Neill, Esq.

OR BK 01974 PG 0570

4



**DOUG SMITH**
Commissioner, District 1

**SUSAN L. VALLIERE**
Commissioner, District 2

**LEE WEBERMAN**
Commissioner, District 3

**SARAH HEARD**
Commissioner, District 4

**MICHAEL DITERLIZZI**
Commissioner, District 5

**DANIEL D. HUDSON**
Interim County Administrator

**STEPHEN FRY**
County Attorney

# MARTIN COUNTY
## BOARD OF COUNTY COMMISSIONERS
### 2401 S.E. MONTEREY ROAD • STUART, FL 34996

November 4, 2005

Telephone:  (772) 288-5495
Fax:  (772) 288-5960
File:  gmp061.051.aw

RE: Proposal to change the Future Land Use and Zoning District for **Comprehensive Plan Amendment #05-1, Public Lands - Allapattah.**

Dear Property Owner:

This letter is to notify you of an adoption hearing scheduled before the Board of County Commissioners to consider changes to the Future Land Use designations and Zoning District for the property described in the attached legal description and shown on the attached map.

**From:** Agricultural          **To:** Institutional Conservation

And to change the zoning designation:

**From:**  A-2, (Agricultural)          **To:**  PC, (Public Conservation)

The date, time and place of the scheduled adoption hearing is:

MEETING:       Board of County Commissioners (BCC)
DATE:          December 6, 2005
TIME:          9:00 AM, or as soon thereafter as the item can be heard.
PLACE:         Martin County Administrative Center
               Commission Chambers, 1st Floor
               2401 S.E. Monterey Road
               Stuart, FL 34996

All interested persons are invited to attend the above-described hearing and will have an opportunity to speak.

**Accessibility arrangements:** If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Office of the County Administrator at (772) 221-2360, or in writing to 2401 S.E. Monterey Road, Stuart, FL 34996, no later than three days before the meeting date. If you are hearing or voice impaired, please call the TDD line at (772) 288-5940.

**Record for appeals:** If any person decides to appeal any decisions made with respect to any matter considered at the meetings or hearings of any board, committee, commission, agency, council, or advisory group, that person will need a record of the proceedings and, for such purpose, may need to ensure that a verbatim record of the proceedings is made, which record should include the testimony and evidence upon which the appeal is to be based.

**Comprehensive Planning Facts:** The Future Land Use Map is adopted as part of the County's Comprehensive Growth Management Plan and is one of the primary tools for managing land development. The Future Land Use designation of a parcel of land determines the general type of use allowed, as well as the maximum level of density or intensity allowed (such as the number of residential units per acre). The zoning regulations provide one or more zoning districts for implementing each Future Land Use designation.

**TELEPHONE**
772-288-5400

**WEB ADDRESS**
http://www.martin.fl.us

The zoning designation of a parcel of land determines, in more detail than the Future Land Use designation, what type and level of development may occur. A change to the Future Land Use Map requires three public hearings as follows:

1.    Local Planning Agency (which makes a recommendation to the Board of County Commissioners).

2.    Board of County Commissioners (to determine whether the proposed amendment should be transmitted to the Florida Department of Community Affairs, the state land planning agency that oversees and coordinates comprehensive planning).

3.    Board of County Commissioners (to determine whether the proposed amendment should be adopted.)

**Public involvement opportunities:** All interested persons are invited to attend any or all of the above-described hearings and will have an opportunity to speak. All application files are available for public inspection during business hours at the address below. Written comments will be included as part of the public record of the application.

**You may view application files at:** Martin County Administrative Center, Growth Management Department, 2nd Floor, located at : 2401 S.E. Monterey Road Stuart, Florida 34996. Please submit written comments to: Nicki van Vonno, Director, Martin County Growth Management Department, 2401 S.E. Monterey Road Stuart, Florida 34996

For more information, contact the Martin County Growth Management Department, Comprehensive Planning Division at (772) 288-5495.

Sincerely,

*Nicki van Vonno*

Nicki van Vonno, AICP
Growth Management Director

Enclosures

NvV:RWL

cc:    File



Zut

# Real Estate Inventory

Property Control # _See Warranty Deeds_

Resolution # 02-11.2
02-11.1

O.R. Book _1722_  Page _2/88_
                         _2/93_

1722
1722

Purchase Price _$21,057,103.00_
or Value _As paid $2,509,017.69_

Date of Transfer _7/7/03_
Purchased _✓_ or Donated _____  And Exchange_

Legal Description:

Description/Use:

_See Warranty Deeds_                     _Allapattah   Parcel "C"_

Size _____ acres ±

Address:

Structures?  Yes  or  No  (Circle)

Seller: _Allapattah Properties Partnership_

Buyer: _SWMD 75% Martin Co. 25%_

### Type of Instrument:

_(2)✓_  County Deed    Quit-Claim Deed _____

Warranty Deed _____
Easement/Type _____

Restrictions (if any) _____

### Title Policy

Company _First American Title Ins._

Title Policy # _____

### Appraisals

Company _____  Date: _____  Amount _____

Company _____  Date: _____  Amount _____

Prepared by: _Gh_ Date: _4/14/03_ Dept: _Legal_

Distribution - Original Form to Property Management with copy of Instrument - Copies to Accounting, Legal List, Interested Depts.
_Care of Water Quality. Com. Fee._

\inventor.frm 6/24/96

This Instrument prepared by:
Holly Walter, Esq., Attorney
South Florida Water Management District
3301 Gun Club Road, P.O. Box 24680
West Palm Beach, FL 33416-4680

Return to:
Kathleen A. Massey, Closing Specialist
South Florida Water Management District
3301 Gun Club Road, P.O. Box 24680
West Palm Beach, FL 33416-4680

Tax Folio #_____

Project: Allapattah Ranch
Tract: GM 100-007

INSTR # 1561698
OR BK 01632 PG 1160
RECORDED 03/28/2002 02:54 PM
MARSHA EWING
MARTIN COUNTY Florida
DOC TAX 207,672.50
RECORDED BY L Wood

## WARRANTY DEED

THIS INDENTURE made this 27ᵗʰ day of MARCH , 2002, between **ALLAPATTAH PROPERTIES PARTNERSHIP**, a Florida general partnership, the Grantor, whose mailing address is c/o Mr. Rolla Mottaz, 1104 Devonshire Way, Palm Beach Gardens, Florida, 33418, Palm Beach County, in consideration of the sum of TEN DOLLARS ($10.00) and other valuable consideration, received from **SOUTH FLORIDA WATER MANAGEMENT DISTRICT**, a public corporation of the State of Florida, with its principal office at 3301 Gun Club Road, West Palm Beach, FL 33406, and whose mailing address is P.O. Box 24680, West Palm Beach, FL 33416-4680, Palm Beach County, as to an undivided Seventy-five percent (75%) interest, and **MARTIN COUNTY**, a political subdivision of the State of Florida, with its principal office at 2401 S.E. Monterey Road, Stuart, Florida 34996, as to an undivided Twenty-five percent (25%) interest, jointly and severally, the Grantee, the receipt of which is hereby acknowledged hereby grants, bargains, sells and conveys to the Grantee, its successors and assigns forever, the real property located in Martin County, Florida, described as:

See Exhibit "A" attached hereto and made a part hereof.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

Reserving unto Grantor a perpetual easement (the "Access and Utility Easement") on, over, under, across and through that certain real property legally described and depicted in Exhibit "B" attached hereto and made a part hereof (hereinafter referred to as the "Easement Parcel"). This Access and Utility Easement is reserved to Grantor on, over, under and through the West 110 feet of the S 3/4 of Section 15, Township 38 South, Range 39 East as shown on Exhibit "B" connecting State Road 714 to that certain real property ownership of which is retained by Grantor described as Sections 3, 4, 10 and the N 1/4 of Section 15, Township 38 South, Range 39 East (the "Benefited Property" or "Dominant Tenement") for the benefit of Grantor, Grantor's officers, agents, employees, guests, lessees, licensees, contractors, subcontractors, successors and assigns, and any person doing business with any of them for the purpose of the installation and use of

Exhibit "A"
Tract No. GM-100-005

All of Sections 23, 24, 25 and 36, and those portions of Sections 22, 26, 27 and 35 lying either Northerly or Easterly of the following described line:

Start at a point on the North line of Section 21, Township 38 South, Range 38 East, said POINT OF BEGINNING being 1349.0 feet Easterly of the Northwest corner of said Section 21; thence run North 89°55'15" East along the North line of said Section 21, 4047.00 feet to the Northeast corner of said Section 21; thence run South 89°42' East, along the North line of Section 22, Township 38 South, Range 38 East, 629.46 feet to the POINT OF BEGINNING; thence run South 4167.78 feet; thence run South 36°51' East 3830.30 feet; thence run South 89°02' East 2902.00 feet; thence run South 00°37' West 1427.70 feet; thence run North 89°58' West 111.00 feet; thence run South 2°03' East 256.69 feet; thence run South 9°55' East 1237.93 feet; thence run South 4°05' East 2534.49 feet; thence run South 50°11' East 1211.22 feet; thence run South 57°34' East 662.84 feet; thence run South 56°25' East 292.95 feet; thence run South 49°53' East 2741.33 feet to the South line of Section 35, Township 38 South, Range 38 East. All of said lands lying and being in Township 38 South, Range 38 East, Martin County, Florida.

LESS the Rights-of-way for SR 714 and SR-S609.

Together With:

All the property purchased by Julian I. Raskin from Allapattah Cattle Company as particularly set forth in Corrective Warranty Deed from Marshall M. Criser to Julian I. Raskin in deed recorded in Book 99, Page 359, Martin County Public Records, and more particularly described as follows:

Begin at a point on the North line of Section 21, Township 38 South, Range 38 East, that is 1349.00 feet Easterly of the Northwest corner of said Section 21; thence run North 89°55'15" East, along the North line of said Section 21, 4047.00 feet to the Northeast corner of said Section 21; thence run South 89°42' East along the North line of Section 22, Township 38 South, Range 38 East, 629.46 feet; thence run South 4,167.78 feet; thence run South 36°51' East 3830.30 feet; thence run South 89°02' East 2,902.00 feet; thence run South 0°37' West 1,427.70 feet; thence run North 89°58' West 111.00 feet; thence run South 2°03' East 256.69 feet; thence run South 9°55' East 1,237.93 feet; thence run South 4°05' East 2,534.49 feet; thence run South 50°11' East 1,211.22 feet; thence run South 57°34' East 662.84 feet; thence run South 56°25' East 292.95 feet; thence run South 49°53' East 2,741.33 feet to the South line of Section 35, Township 38 South, Range 38 East; thence North 89°25'13" West, along said South line of Section 35, 4,676.19 feet to the Southwest corner of said Section 35; thence run North 89°32'49" West, along the South line of Section 34, Township 38 South, Range 38 East, 2,667.88 feet to the quarter Section corner; thence run North 0°16'32" West, along the quarter Section line, 5,389.72 feet to the North line of said Section 34; thence run North 0°31' East 1,274.43 feet; thence run North 89°40'28" West 2,631.81 feet to the West line of Section 27, Township 38 South, Range 38 East; thence run South 89°38'40" West

- 1 -

The East 660.00 feet of the West 700.00 feet of the Northwest quarter of Section 34; and the East 660 feet of the West 700.00 feet of the South half of the Southwest quarter of Section 27; all being in Township 38 South, Range 38 East, Martin County, Florida.

Also, LESS, the Rights-of-Way for Fox Brown Road as conveyed in Official Records Book 1499, Page 138 and Official Records Book 1499, Page 155.

Also, LESS, a tract of land in Section 34, Township 38 South, Range 38 East, as described in Official Records Book 830, Page 493.

Also, LESS the following described property;

All that portion of a 100.00 foot Right-of-Way lying in the East half of Section 34, Township 38 South, Range 38 East, Martin County, Florida, and lying within 50.00 feet of each side of the following described centerline:

Begin at the Northwest corner of Section 21, Township 38 South, Range 38 East; thence, run South 00°14'22" East, along the line common to Sections 20 and 21, a distance of 5,127.06 feet to the Southwest corner of Section 21; thence, run South 00°01' East, along the line common to Sections 28 and 29, a distance of 5,228.90 feet to the Southwest corner of Section 28; thence, continue to run South 00°01' East, along the line common to Sections 32 and 33, a distance of 1,662.14 feet; thence, by curve to the left of radius 1,000.39 feet, run a distance along the arc of 1,571.04 feet through a central angle of 89°58'44" to a point on a line dividing the North and South halves of Section 33; thence, run South 89°59'44" East, along said dividing line, a distance of 4,262.92 feet to the East line of Section 33; thence in Section 34, continue to run South 89°59'44" East, a distance of 1,081.17 feet; thence by curve to the right of radius 1,657.99 feet, run a distance along the arc of 1,799.66 feet; thence, run South 27°48'15" East, a distance of 2,066.52 feet to the South line of Section 34; all of the foregoing being located in Township 38 South, Range 38 East.

Containing 7259.97 acres, more of less.

R:\Legals\\allapattah\100-005.lgl
August 14, 2001
Revised: October 23, 2001
Revised: October 24, 2001
Revised: November 02, 2001
Revised: June 14, 2002
Revised: October 04, 2002
Revised: October 07, 2002
Revised: January 13, 2003

LEGAL DESCRIPTION
January 13, 2003

Exhibit "A"
Tract No. GM-100-012

A 100.00 foot Right-of-Way in the East half of Section 34, Township 38 South, Range 38 East and lying within 50.00 feet of each side of the following described centerline:

Begin at the Northwest corner of Section 21, Township 38 South, Range 38 East; thence, run South 00°14'22" East, along the line common to Sections 20 and 21, a distance of 5,127.06 feet to the Southwest corner of Section 21; thence, run South 00°01' East, along the line common to Sections 28 and 29, a distance of 5,228.90 feet to the Southwest corner of Section 28; thence, continue to run South 00°01' East, along the line common to Sections 32 and 33, a distance of 1,662.14 feet; thence, by curve to the left of radius 1,000.39 feet, run a distance along the arc of 1,571.04 feet through a central angle of 89°58'44" to a point on a line dividing the North and South halves of Section 33; thence, run South 89°59'44" East, along said dividing line, a distance of 4,262.92 feet to the East line of Section 33; thence in Section 34, continue to run South 89°59'44" East, a distance of 1,081.17 feet; thence by curve to the right of radius 1,657.99 feet, run a distance along the arc of 1,799.66 feet; thence, run South 27°48'15" East, a distance of 2,066.52 feet to the South line of Section 34; all of the foregoing being located in Township 38 South, Range 38 East.

Containing 2.6 acres, more or less.

R:\Legals\allapattah\100-012.lgl
October 4, 2002
October 7, 2002

LEGAL DESCRIPTION
October 7, 2002

Stacy Semmes

Exhibit "A"
Tract No. GM-100-012

A 100.00 foot Right-of-Way in the East half of Section 34, Township 38 South, Range 38 East and lying within 50.00 feet of each side of the following described centerline:

Begin at the Northwest corner of Section 21, Township 38 South, Range 38 East; thence, run South 00°14'22" East, along the line common to Sections 20 and 21, a distance of 5,127.06 feet to the Southwest corner of Section 21; thence, run South 00°01' East, along the line common to Sections 28 and 29, a distance of 5,228.90 feet to the Southwest corner of Section 28; thence, continue to run South 00°01' East, along the line common to Sections 32 and 33, a distance of 1,662.14 feet; thence, by curve to the left of radius 1,000.39 feet, run a distance along the arc of 1,571.04 feet through a central angle of 89°58'44" to a point on a line dividing the North and South halves of Section 33; thence, run South 89°59'44" East, along said dividing line, a distance of 4,262.92 feet to the East line of Section 33; thence in Section 34, continue to run South 89°59'44" East, a distance of 1,081.17 feet; thence by curve to the right of radius 1,657.99 feet, run a distance along the arc of 1,799.66 feet; thence, run South 27°48'15" East, a distance of 2,066.52 feet to the South line of Section 34; all of the foregoing being located in Township 38 South, Range 38 East.

Containing 2.6 acres, more or less.

R:\Legals\allapattah\100-012.lgl
October 4, 2002
October 7, 2002

LEGAL DESCRIPTION
October 7, 2002

*[signature]*

**Exhibit "A"**
**Tract No. GM-100-010**

The South three-quarters of Section 15, in Township 38 South, Range 39 East, Martin County, Florida.

Less the Rights-of Way for S.R.-714.

Subject to an easement for ingress and egress purposes over the existing road bed which lies along the West line of said South three-quarters of said Section 15.

Containing 461.36 acres, more or less.

R:\Legals\allapattah\100-010.lgl
September 3, 2002

```
LEGAL DESCRIPTION
September 3, 2002
```

SFWMD

3/15/02  11:46  PAGE  5/8    RightFAX

OP K 01632  PG 1162

## Exhibit "A"
### Tract No. GM-100-007

**Parcel A:**

Sections 5 to 9 inclusive and the South three-quarters of Section 15 and all of Sections 16 to 18 inclusive, in Township 38 South, Range 39 East, Martin County, Florida.

Less the Rights-of-Way for the C-23 Canal, S.R.-714, and S.R.-S609.

Subject to an easement for ingress and egress purposes over the existing road bed which lies along the West line of said South three-quarters of said Section 15.

Containing 5,574.47 acres, more or less.

**Together With Parcel B:**

Sections 19 to 22 inclusive and 27 to 34 inclusive, in Township 38 South, Range 39 East, Martin County, Florida.

Less the tract described in Deed Book 15, Page 72, the tract described in Official Records Book 789, Page 184, and the Rights-of-way for S.R.-714 and S.R.-S609.

Containing 7,611.07 acres, more or less.

Combined acreage for Parcels A and B is 13,185.54, more or less.

R:\Legals\allapattah\100-007.lgl
December 12, 2001

```
LEGAL DESCRIPTION
December 12, 2001

[signature]
```

- 1 -

Allapattah Property

LEGEND

600' Buffer
Subject Property

Scale: 1" = 6000'

Allapattah Property

LEGEND

600' Buffer
Subject Property

Scale: 1"=6000'

St. Lucie County
Martin County

Range 38 East
Range 39 East

Township 38 South
Township 39 South

# Allapattah Property

LEGEND

600' Buffer
Subject Property

Scale: 1"=6000'

Range 38 East
Range 39 East

Township 38 South
Township 39 South

St. Lucie County
Martin County

CCX
INCORPORATED

**Exhibit "A"**
**Tract No. GM-100-010**

The South three-quarters of Section 15, in Township 38 South, Range 39 East, Martin County, Florida.

Less the Rights-of Way for S.R.-714.

Subject to an easement for ingress and egress purposes over the existing road bed which lies along the West line of said South three-quarters of said Section 15.

Containing 461.36 acres, more or less.

R:\Legals\allapattah\100-010.lgl
September 3, 2002

```
LEGAL DESCRIPTION
 September 3, 2002

   Stacy Summers
```

INSTR # 1561698
OR BK 01632 PG 1160
RECORDED 03/28/2002 02:54 PM
MARSHA EWING
MARTIN COUNTY Florida
DOC TAX 207,672.50
RECORDED BY L Wood

This Instrument prepared by:
Holly Walter, Esq., Attorney
South Florida Water Management District
3301 Gun Club Road, P.O. Box 24680
West Palm Beach, FL 33416-4680

Return to:
Kathleen A. Massey, Closing Specialist
South Florida Water Management District
3301 Gun Club Road, P.O. Box 24680
West Palm Beach, FL 33416-4680

Tax Folio #_____

Project: Allapattah Ranch
Tract: GM 100-007

## WARRANTY DEED

THIS INDENTURE made this 27th day of MARCH, 2002, between **ALLAPATTAH PROPERTIES PARTNERSHIP**, a Florida general partnership, the Grantor, whose mailing address is c/o Mr. Rolla Mottaz, 1104 Devonshire Way, Palm Beach Gardens, Florida, 33418, Palm Beach County, in consideration of the sum of TEN DOLLARS ($10.00) and other valuable consideration, received from **SOUTH FLORIDA WATER MANAGEMENT DISTRICT**, a public corporation of the State of Florida, with its principal office at 3301 Gun Club Road, West Palm Beach, FL 33406, and whose mailing address is P.O. Box 24680, West Palm Beach, FL 33416-4680, Palm Beach County, as to an undivided Seventy-five percent (75%) interest, and **MARTIN COUNTY**, a political subdivision of the State of Florida, with its principal office at 2401 S.E. Monterey Road, Stuart, Florida 34996, as to an undivided Twenty-five percent (25%) interest, jointly and severally, the Grantee, the receipt of which is hereby acknowledged hereby grants, bargains, sells and conveys to the Grantee, its successors and assigns forever, the real property located in Martin County, Florida, described as:

See Exhibit "A" attached hereto and made a part hereof.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

Reserving unto Grantor a perpetual easement (the "Access and Utility Easement") on, over, under, across and through that certain real property legally described and depicted in Exhibit "B" attached hereto and made a part hereof (hereinafter referred to as the "Easement Parcel"). This Access and Utility Easement is reserved to Grantor on, over, under and through the West 110 feet of the S 3/4 of Section 15, Township 38 South, Range 39 East as shown on Exhibit "B" connecting State Road 714 to that certain real property ownership of which is retained by Grantor described as Sections 3, 4, 10 and the N 1/4 of Section 15, Township 38 South, Range 39 East (the "Benefited Property" or "Dominant Tenement") for the benefit of Grantor, Grantor's officers, agents, employees, guests, lessees, licensees, contractors, subcontractors, successors and assigns, and any person doing business with any of them for the purpose of the installation and use of

Exhibit "A"
Tract No. GM-100-012

A 100.00 foot Right-of-Way in the East half of Section 34, Township 38 South, Range 38 East and lying within 50.00 feet of each side of the following described centerline:

Begin at the Northwest corner of Section 21, Township 38 South, Range 38 East; thence, run South 00°14'22" East, along the line common to Sections 20 and 21, a distance of 5,127.06 feet to the Southwest corner of Section 21; thence, run South 00°01' East, along the line common to Sections 28 and 29, a distance of 5,228.90 feet to the Southwest corner of Section 28; thence, continue to run South 00°01' East, along the line common to Sections 32 and 33, a distance of 1,662.14 feet; thence, by curve to the left of radius 1,000.39 feet, run a distance along the arc of 1,571.04 feet through a central angle of 89°58'44" to a point on a line dividing the North and South halves of Section 33; thence, run South 89°59'44" East, along said dividing line, a distance of 4,262.92 feet to the East line of Section 33; thence in Section 34, continue to run South 89°59'44" East, a distance of 1,081.17 feet; thence by curve to the right of radius 1,657.99 feet, run a distance along the arc of 1,799.66 feet; thence, run South 27°48'15" East, a distance of 2,066.52 feet to the South line of Section 34; all of the foregoing being located in Township 38 South, Range 38 East.

Containing 2.6 acres, more or less.

R:\Legals\allapattah\100-012.lgl
October 4, 2002
October 7, 2002

LEGAL DESCRIPTION
October 7, 2002

*[signature]*

Exhibit "A"
Tract No. GM-100-012

A 100.00 foot Right-of-Way in the East half of Section 34, Township 38 South, Range 38 East and lying within 50.00 feet of each side of the following described centerline:

Begin at the Northwest corner of Section 21, Township 38 South, Range 38 East; thence, run South 00°14'22" East, along the line common to Sections 20 and 21, a distance of 5,127.06 feet to the Southwest corner of Section 21; thence, run South 00°01' East, along the line common to Sections 28 and 29, a distance of 5,228.90 feet to the Southwest corner of Section 28; thence, continue to run South 00°01' East, along the line common to Sections 32 and 33, a distance of 1,662.14 feet; thence, by curve to the left of radius 1,000.39 feet, run a distance along the arc of 1,571.04 feet through a central angle of 89°58'44" to a point on a line dividing the North and South halves of Section 33; thence, run South 89°59'44" East, along said dividing line, a distance of 4,262.92 feet to the East line of Section 33; thence in Section 34, continue to run South 89°59'44" East, a distance of 1,081.17 feet; thence by curve to the right of radius 1,657.99 feet, run a distance along the arc of 1,799.66 feet; thence, run South 27°48'15" East, a distance of 2,066.52 feet to the South line of Section 34; all of the foregoing being located in Township 38 South, Range 38 East.

Containing 2.6 acres, more or less.

R:\Legals\allapattah\100-012.lgl
October 4, 2002
October 7, 2002

LEGAL DESCRIPTION
October 7, 2002

*Stacy Simmons* (signature)

Exhibit "A"
Tract No. GM-100-005

All of Sections 23, 24, 25 and 36, and those portions of Sections 22, 26, 27 and 35 lying either Northerly or Easterly of the following described line:

Start at a point on the North line of Section 21, Township 38 South, Range 38 East, said POINT OF BEGINNING being 1349.0 feet Easterly of the Northwest corner of said Section 21; thence run North 89°55'15" East along the North line of said Section 21, 4047.00 feet to the Northeast corner of said Section 21; thence run South 89°42' East, along the North line of Section 22, Township 38 South, Range 38 East, 629.46 feet to the POINT OF BEGINNING; thence run South 4167.78 feet; thence run South 36°51' East 3830.30 feet; thence run South 89°02' East 2902.00 feet; thence run South 00°37' West 1427.70 feet; thence run North 89°58' West 111.00 feet; thence run South 2°03' East 256.69 feet; thence run South 9°55' East 1237.93 feet; thence run South 4°05' East 2534.49 feet; thence run South 50°11' East 1211.22 feet; thence run South 57°34' East 662.84 feet; thence run South 56°25' East 292.95 feet; thence run South 49°53' East 2741.33 feet to the South line of Section 35, Township 38 South, Range 38 East. All of said lands lying and being in Township 38 South, Range 38 East, Martin County, Florida.

LESS the Rights-of-way for SR 714 and SR-S609.

Together With:

All the property purchased by Julian I. Raskin from Allapattah Cattle Company as particularly set forth in Corrective Warranty Deed from Marshall M. Criser to Julian I. Raskin in deed recorded in Book 99, Page 359, Martin County Public Records, and more particularly described as follows:

Begin at a point on the North line of Section 21, Township 38 South, Range 38 East, that is 1349.00 feet Easterly of the Northwest corner of said Section 21; thence run North 89°55'15" East, along the North line of said Section 21, 4047.00 feet to the Northeast corner of said Section 21; thence run South 89°42' East along the North line of Section 22, Township 38 South, Range 38 East, 629.46 feet; thence run South 4,167.78 feet; thence run South 36°51' East 3830.30 feet; thence run South 89°02' East 2,902.00 feet; thence run South 0°37' West 1,427.70 feet; thence run North 89°58' West 111.00 feet; thence run South 2°03' East 256.69 feet; thence run South 9°55' East 1,237.93 feet; thence run South 4°05' East 2,534.49 feet; thence run South 50°11' East 1,211.22 feet; thence run South 57°34' East 662.84 feet; thence run South 56°25' East 292.95 feet; thence run South 49°53' East 2,741.33 feet to the South line of Section 35, Township 38 South, Range 38 East; thence run North 89°25'13" West, along said South line of Section 35, 4,676.19 feet to the Southwest corner of said Section 35; thence run North 89°32'49" West, along the South line of Section 34, Township 38 South, Range 38 East, 2,667.88 feet to the quarter Section corner; thence run North 0°16'32" West, along the quarter Section line, 5,389.72 feet to the North line of said Section 34; thence run North 0°31' East 1,274.43 feet; thence run North 89°40'28" West 2,631.81 feet to the West line of Section 27, Township 38 South, Range 38 East; thence run South 89°38'40" West

The East 660.00 feet of the West 700.00 feet of the Northwest quarter of Section 34; and the East 660 feet of the West 700.00 feet of the South half of the Southwest quarter of Section 27; all being in Township 38 South, Range 38 East, Martin County, Florida.

Also, LESS, the Rights-of-Way for Fox Brown Road as conveyed in Official Records Book 1499, Page 138 and Official Records Book 1499, Page 155.

Also, LESS, a tract of land in Section 34, Township 38 South, Range 38 East, as described in Official Records Book 830, Page 493.

Also, LESS the following described property;

All that portion of a 100.00 foot Right-of-Way lying in the East half of Section 34, Township 38 South, Range 38 East, Martin County, Florida, and lying within 50.00 feet of each side of the following described centerline:

Begin at the Northwest corner of Section 21, Township 38 South, Range 38 East; thence, run South 00°14'22" East, along the line common to Sections 20 and 21, a distance of 5,127.06 feet to the Southwest corner of Section 21; thence, run South 00°01' East, along the line common to Sections 28 and 29, a distance of 5,228.90 feet to the Southwest corner of Section 28; thence, continue to run South 00°01' East, along the line common to Sections 32 and 33, a distance of 1,662.14 feet; thence, by curve to the left of radius 1,000.39 feet, run a distance along the arc of 1,571.04 feet through a central angle of 89°58'44" to a point on a line dividing the North and South halves of Section 33; thence, run South 89°59'44" East, along said dividing line, a distance of 4,262.92 feet to the East line of Section 33; thence in Section 34, continue to run South 89°59'44" East, a distance of 1,081.17 feet; thence by curve to the right of radius 1,657.99 feet, run a distance along the arc of 1,799.66 feet; thence, run South 27°48'15" East, a distance of 2,066.52 feet to the South line of Section 34; all of the foregoing being located in Township 38 South, Range 38 East.

Containing 7259.97 acres, more of less.

R:\Legals\allapattah\100-005.lgl
August 14, 2001
Revised: October 23, 2001
Revised: October 24, 2001
Revised: November 02, 2001
Revised: June 14, 2002
Revised: October 04, 2002
Revised: October 07, 2002
Revised: January 13, 2003

LEGAL DESCRIPTION
January 13, 2003

LOCATION MAP

Allapattah

# Real Estate Inventory

Property Control # _See Warranty Deeds_    O.R. Book _1722_ _1722_ _1722_    Page _2188_ _2193_    Resolution # _02-11.2_ _02-11.1_

Purchase Price _$21,057,103.00_    Date of Transfer _1/16/03_

or Value _As paid_ _$2,504,017.69_    Purchased _____ or Donated _____ and Exchange

Legal Description:                                      Description/Use:

_See Warranty Deeds_                        _Allapattah Parcel "C"_

Size _____ acres ±                       Address:

Seller: _Allapattah Properties Partnership_    Structures? Yes or No (Circle)

Buyer: _SFWMD 75% Martin Co. 25%_

### Type of Instrument:

Warranty Deed _(2)✓_    County Deed _____    Quit-Claim Deed _____

Easement/Type _____

Restrictions (if any) _____

### Title Policy

Title Policy #                             Company _First American Title Ins._

### Appraisals

Company _____  Date: _____    Amount _____

Company _____  Date: _____    Amount _____

Prepared by: _GH_ Date: _4/14/03_ Dept: _Legal_   Distribution - Original Form to Property Management with copy of Instrument - Copies to Accounting, Legal, List, Interested Depts. _Office of Water Quality Com. Rec._



# MARTIN COUNTY
## BOARD OF COUNTY COMMISSIONERS
2401 S.E. MONTEREY ROAD • STUART, FL 34996

November 4, 2005

Telephone:  (772) 288-5495
Fax:        (772) 288-5960
File:       gmp06l.051.aw

**DOUG SMITH**
Commissioner, District 1

**SUSAN L. VALLIERE**
Commissioner, District 2

**LEE WEBERMAN**
Commissioner, District 3

**SARAH HEARD**
Commissioner, District 4

**MICHAEL DITERLIZZI**
Commissioner, District 5

**DANIEL D. HUDSON**
Interim County Administrator

**STEPHEN FRY**
County Attorney

RE: Proposal to change the Future Land Use and Zoning District for **Comprehensive Plan Amendment #05-1, Public Lands - Allapattah.**

Dear Property Owner:

This letter is to notify you of an adoption hearing scheduled before the Board of County Commissioners to consider changes to the Future Land Use designations and Zoning District for the property described in the attached legal description and shown on the attached map.

**From:** Agricultural                  **To:** Institutional Conservation

And to change the zoning designation:

**From:** A-2, (Agricultural)            **To:** PC, (Public Conservation)

The date, time and place of the scheduled adoption hearing is:

**MEETING:**   Board of County Commissioners (BCC)
**DATE:**      December 6, 2005
**TIME:**      9:00 AM, or as soon thereafter as the item can be heard.
**PLACE:**     Martin County Administrative Center
               Commission Chambers, 1st Floor
               2401 S.E. Monterey Road
               Stuart, FL 34996

All interested persons are invited to attend the above-described hearing and will have an opportunity to speak.

**Accessibility arrangements:** If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Office of the County Administrator at (772) 221-2360, or in writing to 2401 S.E. Monterey Road, Stuart, FL 34996, no later than three days before the meeting date. If you are hearing or voice impaired, please call the TDD line at (772) 288-5940.

**Record for appeals:** If any person decides to appeal any decisions made with respect to any matter considered at the meetings or hearings of any board, committee, commission, agency, council, or advisory group, that person will need a record of the proceedings and, for such purpose, may need to ensure that a verbatim record of the proceedings is made, which record should include the testimony and evidence upon which the appeal is to be based.

**Comprehensive Planning Facts:** The Future Land Use Map is adopted as part of the County's Comprehensive Growth Management Plan and is one of the primary tools for managing land development. The Future Land Use designation of a parcel of land determines the general type of use allowed, as well as the maximum level of density or intensity allowed (such as the number of residential units per acre). The zoning regulations provide one or more zoning districts for implementing each Future Land Use designation.

**TELEPHONE**
772-288-5400

**WEB ADDRESS**
http://www.martin.fl.us

The zoning designation of a parcel of land determines, in more detail than the Future Land Use designation, what type and level of development may occur. A change to the Future Land Use Map requires three public hearings as follows:

1.      Local Planning Agency (which makes a recommendation to the Board of County Commissioners).

2.      Board of County Commissioners (to determine whether the proposed amendment should be transmitted to the Florida Department of Community Affairs, the state land planning agency that oversees and coordinates comprehensive planning).

3.      Board of County Commissioners (to determine whether the proposed amendment should be adopted.)

**Public involvement opportunities:** All interested persons are invited to attend any or all of the above-described hearings and will have an opportunity to speak. All application files are available for public inspection during business hours at the address below. Written comments will be included as part of the public record of the application.

**You may view application files at:** Martin County Administrative Center, Growth Management Department, 2nd Floor, located at : 2401 S.E. Monterey Road Stuart, Florida 34996. Please submit written comments to: Nicki van Vonno, Director, Martin County Growth Management Department, 2401 S.E. Monterey Road Stuart, Florida 34996

For more information, contact the Martin County Growth Management Department, Comprehensive Planning Division at (772) 288-5495.

Sincerely,

*Nicki van Vonno*

Nicki van Vonno, AICP
Growth Management Director

Enclosures

NvV:RWL

cc:      File

02/06/2007  11:08    7722885714    MC CCC ACCOUNTING    PAGE  02/07

020607          Martin County Clerk of Circuit Court              Page 1
                     Subsidiary Ledgers COURT FUNDS

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

CF 04 00146 CA G.MAY - CURTIS R. TR                              2,500.00

| TRANSDTE | DOCUMNT | TYPE | - DETAIL TRANSACTION DESCRIPTIONS - | -TRANS AMOUNT- |
|----------|---------|------|-------------------------------------|----------------|
| 02 26 04 | 4002297 | RECT | GEORGE MAY                          | 2,500.00+ |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |
| 00 00 00 |         |      |                                     | .00 |

*57 AC CR. 708*
*MARTIN COUNTY*
*CHARLIE CRIST*
*SERVED, default*
*by SELLOR*

02/06/2007  11:08    7722885714                                    PAGE  05/07
                                              MC CCC ACCOUNTING
020607                 Martin County Clerk of Circuit Court                Page 1
                              Subsidiary Ledgers REGISTRY

TP CASE-NUMBER ------- NAME ------- BOOK PAGE YR CERT STATUTE# CURRENTBALANCE

  RG 04 00529 CA G.MAY VS BEDNER FARM                               2,500.0000
000000000000


    TRANSDTE   DOCUMNT   TYPE  - DETAIL TRANSACTION DESCRIPTIONS -  -TRANS AMOUNT-
    ========   =======   ====  ================================    ==============

    07 13 04   4008129   RECT   GEORGE MAY                              2,500.00+
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00
    00 00 00                                                                 .00

            191 Ac I-95 Indero
        Rd. St. Lucio

Homes.com - Real Estate and Homes For Sale.

http://www.homes.com/Content/ListingDetail.cfm?propID=56126426&Radius=25&Cit

SIGN UP NO

HOMES.COM

RUN FOR OUR SONS

Find a Home    New Homes    Home Values    Foreclosures    Home Finance    Moving

Details
Close
Overview
Map
Financing
Schools
Area Facts
Crime Info
Climate



1-1 of 1

Fort Pierce, FL
$32,000,000

Homes.com - Real Estate and Homes For Sale.

http://www.homes.com/Content/ListingDetail.cfm?propID=56126426&Radius=25&City

194 Acres, NE Corner of I-95 & Indr...Read More
Map
Save
Print
Email

**Get Pre-qualified**

**Can you afford this property?**

**Price**

$ 3200000.00

**Interest Rate**

30 yr. fixed @ 6.5%

**Dwn Pymt**

$ 3200000.00

**Est Pymt**

$ 182035.59

More Calculators
FL Mortgage Rates

**Offered By**

**Agent: Mike Merritt**
View Agent Listings
(772)464-9728
**Office:** Merritt Realty
View Office Listings
(772)464-9728
**Listing courtesy of:** HarmonHomes.com

**Features & Amenities**
194 Acres, NE Corner of I-95 & Indrio Road, Comp Plan allows for 4 Million Sq Ft of Commercial and up to 1,200 Homes. Price $32,000,000.00.
There are no Features or Amenities available for display for this property.

Certain information contained herein is derived from information provided by parties other than Homes.com. All information provided is deemed reliable, but is not guaranteed and should independently verified.

,000 acre development proposed in St. Lucie County : TCPalm.com

http://www.tcpalm.com/news/2007/sep/12/302000-acre-development-proposed/



**TCPALM**
FLORIDA'S TREASURE COAST AND PALM BEACHES

THE TREASURE COAST STORY
READ MORE AT WWW.TCPALM.COM

# 2,000 acre development proposed in St. Lucie County

By Derek Simmonsen

Wednesday, September 12, 2007

The Towns, Villages and Countryside plan, designed to cut down on suburban sprawl in a specific part of northern St. Lucie County, could be the model for a new development west of Interstate 95 that falls outside its boundaries.

If allowed to use TVC rules, the proposed Capron Lakes would have 3,100 residential units along with commercial and industrial space on roughly 2,000 acres of land sitting north of Indrio Road and west of Interstate 95.

Regular development rules would allow only 1,980 homes, but the TVC guidelines would allow for a higher number of residences based on promises to set aside 70 percent open space, include a community park and provide space for businesses that could spur economic development.

The TVC covers 18,000 acres in north St. Lucie County, including land next to Capron Lakes, much of which was previously agricultural space. The area plan requires developers with 500 acres or more to build mixed-use towns and villages, based on European-style planning, rather than sprawling subdivisions, allowing them to buy development rights from property owners with smaller parcels in the area.

A concern of commissioners, though, was making sure that granting an exception to Capron Lakes wouldn't pave the way for future developments farther west.

,000 acre development proposed in St. Lucie County : TCPalm.com    http://www.tcpalm.com/news/2007/sep/12/302000-acre-development-proposed/;

Commissioner Charles Grande said he was worried about creating a "TVC Jr.," which could then be mimicked by other developers. The TVC plan was designed for a specific urban area and should not be used as a model for continued expansion out west, Grande said.

"I think the TVC at this point is a grand and noble experiment and we haven't seen the results yet," Grande said. "Keep in mind we're looking at a village west of where we typically think of urban development...this is quite a concept to lay in front of us."

Commissioner Doug Coward agreed he "didn't want to swing the door open to the west," but said he feels the Capron Lakes area should have been a part of the TVC in the first place. The owners agreed to follow the TVC guidelines 100 percent and the rules are strict, he said.

"I'm really pleased that the development community sees the benefit of this development pattern," Coward said. "I'm excited about us basically finishing off that planning area without setting precedent for rural areas out west."

Past legal challenges to the TVC plan would make it undesirable to make Capron Lakes part of the TVC itself, according to the developer and representatives from the Treasure Coast Regional Planning Council.

Commissioners asked for more time to review the proposal and asked the developer to return in two to four weeks to present the plans again. At this stage, the commission is only being asked to give its input as to whether Capron Lakes can precede under TVC rules.

A 1,938-acre development sitting north of Indrio Road and west of Interstate 95 adjacent to the Towns, Villages and Countryside area.

Under TVC rules, it could have 3,100 residential units, with additional space for retail and industrial space

http://www.tcpalm.com/news/2007/sep/12/302000-acre-development-proposed/

,000 acre development proposed in St. Lucie County : TCPalm.com

Developers are proposing 70 percent would be open space — plans also call for room for a K-8 school and a 25-acre community park



© 2007 Scripps Treasure Coast Newspapers

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY, FLORIDA

CASE NO. 04-528-CA

GEORGE MAY,

        Plaintiff,

vs.

CLEO STERN, individually, and
CLEO STERN, as Trustee, jointly
and severally,

        Defendants.

_____/

## ORDER ON MOTION TO FORFEIT BOND

This cause coming before the Court on the Defendant's Motion to Forfeit Bond, and after a

hearing on same, and the Court being fully advised in the premises, it is hereby

ORDERED AND ADJUDGED: That said Motion *is granted and the Clerk of the Court is instructed to remit the $2500.00 posted by the Plaintiff to the Defendant care of her counsel.*

DONE AND ORDERED in Martin County, Stuart, Florida, this *10* day of
*Oct.*, 2005.

                       ROBERT MAKEMSON, Circuit Judge

Copies furnished to:
J. Stephen Tierney, III, P.O. Box 1270, Ft. Pierce, FL 34954
George May, P.O. Box 32247, Palm Beach Gardens, FL 33420

*St. Lucis County*
*I-95 Induro Rd*

http://urearth.com/26_Acres_I-95_C



Nick Constant Realty    772-332-0751    E-mail

## 26 Acres I-95 quadrant
**Between Vero Beach & Ft Pierce Florida**

$5,500,000.00

1,800' on southbound exit ramp   800' on Indrio Road

http://urearth.com/26_Acres_1-95_C



North to Vero Beach & NY

26 acres L Ind & Com

Indio Rd to US1 & Ft Pierce/Vero

http://urearth.com/26_Acres_1-95_C



A judge is not
A surveyor

Why ORDERS
judgements
without A
survey by A
Registered, Licensed
Florida surveyor,
signed in blue
ink with A RAISED
embossed seal with
A notorized surveyors
Affidavit Attached to
it ARE VOID



**Programs**

### State Lands History

The Trustees of the Internal Improvement Trust Fund, as an agency of Florida Government, was created in 1855. This followed the short-lived attempt to administer State Lands through the Internal Improvement Board (created in 1851). Through the auspices of the Great Pre-Emption Act of 1841, each new state admitted to the Union after that date was given 500,000 acres for the benefit of internal improvements. Together with the lands granted under the Swamp and Overflowed Lands Act of 1850, the State had at its disposal, over 21,000,000 acres of land under its direct control. (Neither of these totals include sovereign submerged lands.) With the creation of the Board of Trustees, the legislature named the internal improvements that were to be benefited, namely the St. Johns-Indian River Canal, the Florida Railroad and the Pensacola Atlantic Railroad, and few others. The Trustees also had say in the governing and sale of Seminary Lands, School Lands and other lands granted for specific purposes.

**Information**

At the beginning of the Internal Improvement Fund, the surveys of land were conducted by Federal agents under the control of the U. S. Surveyor General of Florida. Lands chosen under the 1841 Act, for instance, were selected by agents, who also happened to be U. S. Deputy Surveyors. With the passage of the Swamp and Overflowed Lands Act, the State selected agents of its own (Henry Wells and A. M. Randolph) to chose the lands to which it was entitled. This created some conflict with the Surveyor General's office, as these men were chosen by the Governor of the State. However, this was overcome with the selection of these two gentlemen, both of whom were also experienced U. S. Deputy Surveyors.

History

After the War Between the States, the Trust Fund, which had underwritten the building of the internal improvements named above, was forbidden by a Federal Court injunction from selling or donating lands to benefit other improvements until the bonds, which had been issued with lands a collateral, were paid in full. This suit, brought by Francis Vose and others, actually tied up the development of Florida for a number of years. In 1881, Hamilton Disston, a wealthy and powerful Philadelphia saw manufacturer, was offered 4,000,000 acres of Swamp and Overflowed lands in return for enough funds with which to cancel the debt. Disston received title to these lands for the total of the debt, nearly $1,000,000. The Disston Purchase thus saved the Trustees of the Internal Improvement Trust Fund from facing bankruptcy and international embarrassment.

**Get Free PDF Reader**

[Get Acrobat Reader]

If you rather view the pdfs without downloading Adobe Acrobat Reader, click on the link below:

Conflicts with the Surveyor General's office ended with the abolition of the latter post in 1910, at which time the Trustees took over many of its duties. The most significant effort of the Trustees in the area of surveying came with the Everglades Donation, which resulted in the promulgation of the 1912 rules for the surveying of the Everglades under the direction of F. C. Elliot, Chief Engineer for the Trustees. Another important survey conducted under the Trustees was that of John Newman in the Broward County area between the North and South New River canals. The land records of the State of Florida, which were held by the old Surveyor General's office, became the property of

*Elliot Stone in wrong place*

# Attacking the Problem

Surveying this vast wilderness of swamps and sawgrass was a near impossibility. This was recognized as early as the 1840s when Surveyor General Valentine Conway gave instructions to U.S. Deputy Surveyor George McKay to run his lines west from the Township line until he reached the Everglades and then return, go along the Township line again one mile and then go west until he again reached the Everglades. The resulting survey, which did not require closures in the usual sense, made for awkward land titles later. After the Civil War, Deputies Marcellus Williams and Horatio Jenkins found out just how difficult working in the Everglades could be even at low water. They found there was not enough water to float their canoes, and it was impossible to drag them through the saw-grass and muck.

They attempted to attack the problem from the other coast and found the same difficulty. Unfortunately, their lines approaching from two directions did not meet and much of their work was later abandoned. Other Deputies simply labeled the area impassable swamp and did not penetrate the Everglades in depth.

# Crucial Expeditions

Two expeditions through the Everglades became crucial to the state's case for claiming the Everglades under the Swamp and Overflowed Lands Act of 1850. In 1882-83, Charles F. Hopkins, a deputy surveyor of long standing in Florida, helped to lead the first expedition since the Seminole Wars to traverse north to south through the Everglades. His description, given in an affidavit to U.S. Inspector Frank Flint (or Flynt), gives some of the best detail of the Everglades at that date. Hopkins noted that the first 60 to 65 miles south of Lake Okeechobee were covered with mud of varying depths after which the limestone rock rose to the surface of the land and rendered it useless, "even if drained." He also declared there were a number of islands, "from one to twenty-five acres" that were very rich, though many of them were under the ordinary overflow.

The lands directly south of the great lake were covered with fl owing water, "custard apple swamp," and stunted myrtle and "yama" grass. Even in the dry season, most of this area was covered by one foot of water. Hopkins thought these lands were capable of being drained and made cultivatable since the elevation of Lake Okeechobee was 22 feet above sea level and declining gradually towards the coasts. This was an important piece of evidence.

The second expedition, allegedly done on behalf of the South Florida Railroad, included in its midst civil engineer and surveyor John W. Newman. Newman and the leader of this expedition James Ingraham were employed by railroad magnate Henry Plant, who had agreed with his east coast counterpart Henry Flagler that an exploration for railroad purposes should be undertaken. Newman's comments would be very telling in the discussion of the surveying of the Everglades that soon followed Flint's investigation. In essence, Newman backed Hopkins' evaluation of the land but noted that although the Everglades could be surveyed, it would be impracticable to do so. Flint used Newman's information with telling effect: "Captain Newman in his affidavit estimates what the cost would be to survey that portion that is unsurveyed of the Everglades, and puts it at $30 per mile.

Florida and up the St. Mary's River.  In February, 1800, they located what they believed was the head of the St. Mary's River issuing forth from the Okefenokee Swamp at north latitude 30 deg. 21 min. 39.5 sec. and west longitude 82 deg. 15 min. 45 sec.  They erected a mound on solid ground about 2 miles southwest of it, which from thereafter would be called "Ellicott's Mound."  The distance was calculated from the junction of the Chattahoochee and Flint rivers to the head of the St. Mary's to be 155.2 miles by straight line or great circle, and the initial course for running the line from each terminus was given, with the proper corrections to be made at intervals in order to follow the great circle.  The commissioners signed a joint report of their proceedings and transmitted it to their respective governments.

Thus, as between the United States and Spain, the boundary had been determined.  It only remained for any competent surveyor to follow the directions of the commissioners and mark the boundary on the ground.  There would be no attempt to mark the boundary on the ground for another 19 years, since there was no immediate demand for the land and the Creeks were still a problem.  Georgia could not herself remove the Creek Indians.  The United States Constitution vests sole authority in the Federal Government for making treaties with foreign nations, which includes Indian nations.

By the convention of April 24, 1802, Georgia ceded to the United States all of her territory between the Chattahoochee and the Mississippi rivers.  In return, the United States ceded to Georgia all of its right in any public lands in the remaining geographical boundaries of Georgia and agreed to extinguish the Indian titles as early as could be peaceable done.  This was accomplished in the southern part of the state by treaties with the Creek Nation in 1802, 1805, and 1814.

Soon thereafter, Georgia turned its attention to surveying the land along the Florida border in preparation for making land grants to settlers.  A question was now raised about the true source of the St. Mary's River, there being a belief in Georgia that it was actually farther southwest of the location determined by Ellicott and Minor.  The source of a multi-branched river is not so easily agreed upon.  In 1818, Georgia appointed Generals Floyd, Thompson, and Blackshear to determine if Ellicott's Mound was properly located.  They returned with the opinion that it was.

In 1819 Georgia appointed J. C. Watson to run and mark the boundary line.  Perhaps affected by the earlier belief that Ellicott's Mound was placed too far north, Watson ran his line considerably south of Ellicott's Mound.  Georgia began to make grants in this region, using the Watson Line as its border.

In 1821, Spain transferred Florida to the United States.  In 1825 the surveyor general for the territory of Florida, to prepare for selling the land near the Georgia border, appointed D. F. McNeil to run and mark the line forming the boundary.  The McNeil Line terminated 14 chains north of the Watson Line, but it also terminated south of Ellicott's Mound.

The border controversy between Georgia and Florida was on.  In May, 1826, the United States, in its authority over the Territory of Florida, agreed with the State of Georgia that each would appoint a commissioner to jointly run and mark a new boundary line which would terminate at the place established by Ellicott and Minor.  The United States appointed ex-Governor Thomas M. Randolph of Virginia, and Georgia appointed Thomas Spaulding.  The two of them appointed John McBride as their common surveyor in February, 1827.  The line was not run. Spaulding came to believe, as had been believed earlier in Georgia, that the true source of the

To return to the Opening Page

## Watson Line And The Georgia-Florida Border

Copyright - Duke Vickrey 1998

A careful study of a detailed map showing the border between Florida and Georgia will show a second line running south of the boundary line and identified as the "Watson Line."  Land south of the Watson Line is divided into regular Township square sections one mile on a side.  Land north of the Watson Line, while still in Florida, is divided into smaller units bearing the numbers of the Georgia District and Lot system.   The history of this line and how the land north of it came to be part of Florida is set forth below in a narration derived from the background discussion in the U. S. Supreme Court case of Coffee v. Groover.

From the earliest settlement of Florida by Spain and of the colonies to the north by Great Britain the boundary between the two was in issue.   The first opportunity to resolve it peacefully came in 1763, when Spain ceded Florida to Great Britain, placing authority over both territories in one government.   King George acted swiftly, and on October 7, 1763, proclaimed the northern boundary of Florida as follows:

For that part of Florida west of the Chattahoochee River - the 31st parallel; and

For that part of Florida east of the Chattahoochee River, a straight line from the junction of the Chattahoochee and Flint rivers to the source of the St. Mary's River, and thereafter along the course of the St. Mary's River to the Atlantic Ocean.

On January 20, 1764, the province of Georgia was limited to north of that boundary.

The Treaty of 1783, which ended the Revolutionary War and resulted in Georgia becoming part of the United States, included an acceptance by the United States and Great Britain of the previously established boundary between Georgia and Florida.   In that same year, by separate treaty, Great Britain ceded Florida back to Spain.

By the Treaty of October 27, 1795, Spain and the United States confirmed the previously established boundary and agreed to appoint a joint commission to survey and mark the boundary on the ground.   The United States appointed Andrew Ellicott, Esq. as its commissioner in May, 1796.   After dragging its feet for awhile, Spain appointed Capt. Stephen Minor as its commissioner.   The two, along with their surveyors, ran the line from the Mississippi River to the Chattahoochee River in 1798 and 1799 and determined the geographical coordinates of the junction of the Chattahoochee and Flint rivers as north latitude 30 deg. 42 min. 42.8 sec. and west longitude 84 deg. 53 min. 15 sec.

At this time hostile Creek Indians still occupied the territory in southern Georgia and northern Florida.   Few things upset Indians more than white surveyors on their land, for they had learned that white surveyors were likely to be followed by white settlers.   Ellicott and Minor elected not to survey across the Creek land east of the Chattahoochee, but instead sailed around



:: Education

**FSMS brings you several options to earn continuing education credits with our quality seminars, correspondence courses and now online courses!**

## Education News

### eLearning

**See our new online courses at**       **!**

- FREE! - What Every Surveyor Should Know About Florida's Continuing Education Rule
- ALTA ACSM Standards for Land Title Surveys, #7144 *(6 hr Gen)*
- Geographic Information Systems, #7139 *(6 hr Gen)*
- Plat Law, Chapter 177, F.S., #7146 *(6 hr L&R)*
- Practical Geometry for Surveyors, #7141 *(6 hr Gen)*
- Public Land Survey System, #7147 *(6 hr Gen)*
- Remote Sensing Applications to Surveying and Mapping, #7148 *(6 hr Gen)*

*(Requires Member Log-In)*
Enter your PSM # and Birth Date to view your completed FSMS credit hours online.

**Did you know?** Most settlement stipulations and final orders issued by the Florida Board of Professional Su Mappers include completing Boundary Control and Minimum Technical Standards courses. Our 6-hour Publi System and MTS courses meet those requirements.

### 2006 Education Fees

| | | |
|---|---|---|
| Correspondence Courses and Member Benefit Seminars (6 Hours) | Member | $100 |
| | Non-Member | $150 |
| | Non-Licensed | $ 80 |
| eLearning Courses (6 Hours) | Member | $130 |
| | Non-Member | $180 |
| | Non-Licensed | $ 85 |

## DBPR Information

Did you receive a                                    letter from DBPR?

(5-page .pdf file; as listed on the Florida Department of State website 5/9/2006)

## Ways to Earn Your Required* 24 Continuing Education Credits per Biennium:

- Earn hour-for-hour continuing education credits by completing board-approved FSMS courses or sem
- Earn up to 6 continuing education credits per biennium by attending local chapter, state or national pr meetings
- Earn 2 continuing education credits per day of attendance at meetings of the Board of Professional S Mappers
- Earn 6 continuing education credits for *each semester hour* of a completed course in a "surveying an at a regionally accredited university or college
- Earn up to 6 continuing education credits by researching, writing and publishing a book, paper or artic surveying and mapping

*Newly licensed PSMs are not required to earn continuing education before their first license renewal (61G1 F.A.C.).*

## Member Benefit Seminars

| Date | | Location | |
|---|---|---|---|
| August 16 8:00 - 4:00 | (Course #6961) | Orlando | 6-L&R |
| August 17 7:30 - 4:30 | (Course #7271) | Orlando | 7-Gen |
| Sept. 9 8:30 - 4:30 | | Pensacola Beach | 6-Gen |
| Sept. 15 8:00 - 4:00 | (Course # 6851) | Lake City | 6-Gen |

Have a topic you'd like to learn about? Send your seminar suggestions to

)

Now updated to reflect January 2006 changes!                    6-Gen

6-L&R

-- Coming Soon!     6-Gen

— Coming Soon!     6-Gen

6-L&R

6-Gen

6-Gen

Now updated to reflect April 2006 changes!                    6-L&R

6-Gen

6-Gen

Meets Boundary Control requirements for BPSM final orders/stipulation agreements.

6-Gen

6-Gen

6-Gen

6-Gen

All correspondence courses, with the exceptions of *Stress Management for Surveying Professic Time Management for Surveying Professionals*, are e-mailed upon registration. **If you would like a course mailed, please include $10 for shipping & handling.**

## Professional Development Seminars

*No Professional Development seminars are currently scheduled.*

**Maintenance of Traffic (MOT) Training**
Does your MOT certificate expire this year? Beginning August 1, FSMS will no longer offer registration for MO

FSMS has negotiated a member price with all Florida Safety Councils. As a member of FSMS, you are entitle price (which varies by location). For the Safety Council in your area and specific MOT information please visi

| | |
|---|---|
| **Tallahassee**<br>**Marianna**<br>**Panama City**<br>**Pensacola** | **North Florida Safety Council** |
| **Tampa** | **Tampa Area Safety Council** |
| **Jacksonville** | **Northeast Florida Safety Council** |
| **Daytona Beach** | **Sunshine Safety Council** |
| **Palm Beach County** | **Safety Council of Palm Beach County** |
| **Broward County**<br>**Dade County** | **National Safety Council – S FL Chapter** |
| **Ft. Myers** | **Southwest Florida Safety Council** |
| **Gainesville** | **North Central Florida Safety Council** |
| **Orlando/Merritt Island + statewide** | **Florida Safety Council** |



Sign in

**Google**

Web   Images   Groups   News   Froogle   Local   **more »**

tallahassee meridian          Search | Advanced Search
                                       Preferences

**Web** ·  Results **1 - 10** of about **1,960,000 English** pages for tallahassee meridian. **(0.51 seconds)**

Local results for **meridian** near **Tallahassee, FL**



**Meridian** - 1.6 miles E - Tallahassee, 32301 - (850) 222-2005
**Meridian** Community Svc Grp - 1.6 miles NE - 1500 Mahan Dr # 230, Tallahassee, 32308 - (850) 877-1908
**Meridian** Construction Co - 5.6 miles N - 3639 N Meridian Rd, Tallahassee, 32312 - (850) 668-1182

DAVIS federal land records, Calhoun County, Florida File ...
... Township 1 North - Section 8 **Meridian**/Survey Area : **Tallahassee Meridian** Misc
Document Number : 28192 Act/Treaty Authorizing Sale : Homestead Entry Orig ...
ftp.rootsweb.com/pub/usgenweb/fl/calhoun/land/davisblm.txt - 9k -
Cached - Similar pages

DAVIS federal land records, Walton County, Florida File ...
... 22/1 South/19 West **Meridian**/Survey Area : **Tallahassee Meridian** Misc Document
Number : 22706 Act/Treaty Authorizing Sale : Homestead Entry Orig. ...
ftp.rootsweb.com/pub/usgenweb/fl/walton/land/davisblm.txt - 12k -
Cached - Similar pages
[ More results from ftp.rootsweb.com ]

Hunting Agreement
To permit waterfowl hunting between the western boundary of Section 1, Township 3
South, Range 28 West, **Tallahassee meridian** and the eastern boundary of ...
www.nps.gov/applications/parks/guis/ppdocuments/Agree.htm - 24k -    *F.S. 4/7 Z*
Cached - Similar pages

Section
(7) A tract of submerged land, lying in Section 28, Township 18 South, Range 17 East,
**Tallahassee Meridian**, Citrus County, Florida, more particularly ...
a257.g.akamaitech.net/7/257/2422/05dec20031700/
edocket.access.gpo.gov/cfr_2003/octqtr/50cfr17.108.htm - 39k -
Cached - Similar pages

[PDF] 50 CFR Ch. I (10–1–05 Edition) § 17.108
File Format: PDF/Adobe Acrobat - View as HTML
E., **Tallahassee Meridian**; located in SW ... **Tallahassee Meridian**, Citrus County,
Flor-. ida, more particularly described as follows: ...
a257.g.akamaitech.net/7/257/2422/09nov20051500/
edocket.access.gpo.gov/cfr_2005/octqtr/pdf/50cfr17.108.pdf - Similar pages

FAQ - BLM GLO Records
The original state line between Alabama and Florida did not close against the
**Tallahassee Meridian** survey (which covered all of Florida), but rather against ...
www.glorecords.blm.gov/FAQ.asp - 41k - Cached - Similar pages

W. Allen Thompson, Mgr. Presents: **Tallahassee's** DowntownMarket.com,

and learn to identify resident and visiting birds. Birdsong Nature Center is located
half-way between **Tallahassee** FL & Thomasville GA 2106 **Meridian** Road ...
www.downtownmarket.com/ - 19k - Cached - Similar pages

**Tallahassee**, Florida (FL) Detailed Profile - travel and real ...
Private high schools in **Tallahassee**:. NORTH FLORIDA CHRISTIAN SCH (Students:
1105; Location: 3000 N **MERIDIAN** ROAD; Grades: PK - 12) ...
www.city-data.com/city/Tallahassee-Florida.html - 60k - Cached - Similar pages

USEFUL TABLES: The United States Government Printing Office Style ...
Grand River Guide **Meridian**. (Utah), **Tallahassee Meridian**. (Florida). Grande Ronde
Guide **Meridian**. (Oregon), Teton Guide **Meridian**. (Montana) ...
nsdsa.phdnswc.navy.mil/mspecs/docs/styleman2000/chapter_txt-17.html - 76k -
Cached - Similar pages

MFA - Tree Farmer of the Year
According to the Bureau of Land Management, "The original state line between
Alabama and Florida did not close against the **Tallahassee Meridian** survey ...
www.msforestry.net/adversepossession.html - 45k - Cached - Similar pages

Try your search again on Google Book Search

Goooooooooogle ▶
Result Page:    1  2  3  4  5  6  7  8  9  10    **Next**

Info when you want it, right on your desktop
Free! Download Google Desktop



tallahassee meridian        Search

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve

Google Home - Advertising Programs - Business Solutions - About Google

©2006 Google

*Effect of void*
*Orders, Judgements*
*on Title*

# WHO LAWFULLY OWNS YOUR HOUSE AND OTHER PROPERTY?

The information provided on this web-site is only for the purpose of educating current members of *Citizens for Legal Responsibility* as to Illinois law. For our members in other states, the law may be different, but in most probability it is not. Check with a registered, ethical attorney before proceeding.

It would not surprise *Citizens* that some attorneys may claim that the following information is not Illinois law. These would be the same attorneys who have previously engaged in violating the following law and would be in a conflict of interest should they advise you otherwise. Further the officer of the court may have been involved in fiduciary theft of property, and certainly does not want to be charged with fiduciary fraud.

*Citizens* further suggests that the following Illinois law applies not only to real property but to all property.

**Citizens** is not referring to who holds the mortgage on your house, but who is the true and legal owner of your house.

Nor is **Citizens** referring to whose name is on the title of the property. Your name may be on the title, but you may not own the property in question.

In addition, a title insurance policy is not indicative of who is the true owner of the property.

While person A or party A may lawfully sell a piece of property, whether real property or not, to person B or party B, the sale is lawful only if person A or party A lawfully owned the property which was purchased from a previous lawful owner.

The sale is predicated on the fact that no court was directly or indirectly involved in the sale of that property at any time.

Since a court which engages in a statutory proceeding, such as a divorce, paternity, adoption, probate, bankruptcy, all Federal Courts, etc., is governed by the rules of limited jurisdiction, the law states that there is no presumption that the judge holds jurisdiction. Should the judge engage in any act beyond that which the law or the statute grants him or her authority, the order of the court is void, of no legal force or effect anywhere and at any time.

In such a case, the judicial order granting the sale of the property is void, of no legal force or effect

anywhere. Should the property be sold, the previous owner is still the legal owner of the property, no matter whose name is on the title.

Nor does this apply only to the previous owner. When purchasing property, the purchaser is required to inspect the entire record of the property and of each and every previous judicial case in which the property was involved. In the event that any officer of the court in any previous judicial hearing engaged in "fraud upon the court", or in which the judge engaged in any act which he had no authority to engage in, whether by law or by statute, the owner of the house or property at that previous time remains the legal owner of the house.

In fact, a good case can be made that each and every person who appeared on that property without the true owner's express permission, has engaged in criminal trespass. And each of them may be subject to a claim for damages.

Courts have stated that:

As one example, under Illinois law, during a divorce action, a court has no power to determine property rights since such can be based only upon a valid divorce decree. Should any property be ordered sold by a judge prior the granting of a valid divorce, the judge has engaged in an action beyond which he has any authority. Should the property be sold, the party who lawfully owned the property prior to the court's order, remains the true owner the property.

And it is the purchaser of the property who has the legal burden to establish that the judge issued a valid divorce decree.

Citizens further suggests that, in any divorce action in which property is ordered to be sold prior to the granting of a valid divorce decree, the judge has acted without lawful authority and the divorce decree, even issued later, is not a valid divorce decree.

Courts have also stated that a purchaser of property is not entitled to rely on a judicial proceeding the record of which evinces a lack of jurisdiction.

It is a rule of law that a purchaser, whether he be a party to the record or a stranger, and all subsequent titleholders are chargeable with notice of the condition of the record and are not protected from the consequences of purchasing under a void judgment or decree.

Courts have held that any party, as purchaser at an execution sale, is presumed to be cognizant of every fact pertaining to the status of the judgment.

The general rule is that an execution may not issue upon a void judgment; an execution so issued is itself absolutely void, and such invalidity extends to acts performed thereunder. Accordingly, title does not pass to a purchaser at an execution sale, where the judgment supporting it is void.

Every execution sale and all conveyances or other evidences of title founded thereon depend upon the authority of the officer who makes such sale. If a judgment is void and execution should nevertheless be sued out, it would confer no authority whatever upon the officer executing it and a sale made under it and all official conveyances or other evidences of title founded thereon would be absolutely null and void.

If the order issued by any court is void, then it must be reversed and the plaintiff must be restored to his former condition or status, the same as though the decree had not been rendered.

Should a title company issue a title policy to a purchaser involved in a sale based on a void order, the title company becomes liable in damages under non-contractual tort liability.

A title policy issued to a person who purchases based on a void order does not protect the purchaser. The purchaser does not own the real estate in question (as the true owner remains the owner of the property) and the new purchaser becomes liable for damages.

Further should a real estate salesperson be involved in the sale of real estate based on a void order, that person becomes liable to the true owner of the property. Damages could also be assessed against any party involved in moving or storage of any personal property taken from the involved real estate.

And, since under Illinois law, if the judge has no jurisdiction and property has been sold thereto, then he and all those who advise and act with him, or execute his process, are trespassers of the law. Citizens suggests that if any party should provide financing for the purchase of property based on a void order, that party would also be liable for damages.

The question is who lawfully owns your home that was sold by a court without jurisdiction. No matter whose name is on the title, you are the legal owner of the property if the court was without jurisdiction.

## TAX CONSEQUENCES OF SALE OF PROPERTY

In a discussion with a CPA about the tax consequences of such a sale or purchase of property that was sold in a judicial proceeding wherein the judge did not have jurisdiction, Citizens was apprised of the following:

While any entity may pay the mortgage interest or the property taxes on a specific piece of property, **only** the legal owner may take a legal deduction of such payment on either a Federal or State Income Tax declaration.

Should an entity take a deduction for mortgage interest or property taxes when the entity is not the legal owner, then the entity is committing perjury, and engaged in filing a false income tax return, by claiming a deduction where no legal deduction is allowed.

Since the property tax was paid voluntarily by the entity who was not legally responsible for its payment, the payment is a voluntary payment and the legal owner is not responsible for repayment to the entity paying the

'HO LAWFULLY OWNS YOUR HOUSE AND OTHER PROPERTY?

property tax.

If you have purchased property which has been sold by a judge without jurisdiction, do you want to engage in perjury and filing a false income tax return?

# Additional information may be available to current members of CLR

Copyright© 1999 by *Citizens for Legal Responsibility®*.
    All rights reserved.

    email: clr@clr.org

Click the **back button** on your browser's toolbar once to return to the previous screen.

Created August 6, 1999

Last updated October 6, 1999

PLAINTIFF, GEORGE MAY

ADDENDUM

"B"

PPI Inc., the parent company of Pompano Park Racing and Poker, which is owned by the Isle of Capri Casinos, sent $100,000 last week to the Floridians in Truth and Integrity in Government, the electioneering committee that has sent mailers out backing Crist. Another $25,000 came from the Miccosukee Tribe.

Crist, who has said he won't support an expansion of gambling in Florida, has refrained from commenting on how he would handle the negotiations between the governor's office and the Seminole and Miccosukee indians, who want to replace their bingo-style slot machine with Las Vegas-style slots.

**Posted by Mary Ellen Klas at 07:22 PM on August 19, 2006 in**

A leading Republican campaign consultant who helped wage a last-minute campaign to try to defeat the 2004 slots amendment has paid $12,000 in fines to settle two cases before the Florida Election Commission. The commission on Friday morning approved two separate consent orders with **Roger Pennington,** the chairman of the Committee to Restore Integrity in Politics.

Pennington is a well-known political consultant and owner of a direct-mail firm who has worked on behalf of the Republican Party of Florida as well as Republican candidates. In October 2004, his committee spent more than $300,000 to send out mailers urging voters to defeat an amendment that would authorize slot machines at dog and horse tracks in Broward and Miami-Dade counties. The effort was bankrolled largely by the casino boat operators, including $475,000 from Palm Beach Casino Line. The committee was also involved in another election in Fort Myers.

But the committee was not registered as a political organization that was allowed to urge voters to defeat or approve any measure on the ballot. So the commission earlier this year ruled there was probable cause that Pennington had broken state campaign finance laws.

If the case had gone forward, Pennington could have been hit with fines in excess of $950,000. A lawyer representing Pennington would not comment on why his client decided to settle the case and pay the fines.

ARTICLE XI
AMENDMENTS

SECTION 5. Amendment or revision election.--
(a) A proposed amendment to or revision of this constitution, or any part of it, shall be submitted to the electors at the next general election held more than ninety days after the joint resolution, initiative petition or report of revision commission, constitutional convention or taxation and budget reform commission proposing it is filed with the custodian of state records, unless, pursuant to law enacted by the affirmative vote of three-fourths of the membership of each house of the legislature and limited to a single amendment or revision, it is submitted at an earlier special election held more than ninety days after such filing.

(b) A proposed amendment or revision of this constitution, or any part of it, by initiative shall be submitted to the electors at the general election provided the initiative petition is filed with the custodian of state records no later than February 1 of the year in which the general election is held.

(c)(b) The legislature shall provide by general law, prior to the holding of an election pursuant to this section, for the provision of a statement to the public regarding the probable financial impact of any amendment proposed by initiative pursuant to section 3.

(d)(c) Once in the tenth week, and once in the sixth week immediately preceding the week in which the election is held, the proposed amendment or revision, with notice of the date of election at which it will be submitted to the electors, shall be published in one newspaper of general circulation in each county in which a newspaper is published.

(e)(d) If the proposed amendment or revision is approved by vote of the electors, it shall be effective as an amendment to or revision of the constitution of the state on the first Tuesday after the first Monday in January following the election, or on such other date as may be specified in the amendment or revision.

**Amendment 3**

Section 1. Article I, Section 26 is created to read "Claimant's right to fair compensation." In any medical liability claim involving a contingency fee, the claimant is entitled to receive no less than 70% of the first $250,000.00 in all damages received by the claimant, exclusive of reasonable and customary costs, whether received by judgment, settlement, or otherwise, and regardless of the number of defendants. The claimant is entitled to 90% of all damages in excess of $250,000.00, exclusive of reasonable and customary costs and regardless of the number of defendants. This provision is self-executing and does not require implementing legislation.

Section 2. This Amendment shall take effect on the day following approval by the voters.

*void, "sham"*    **Amendment 4**    *UNConstitutional*

Article X, Florida Constitution, is hereby amended to add the following as section 19:

SECTION 19. SLOT MACHINES - *without subject matter jurisdiction Amendment*

(a) After voter approval of this constitutional amendment, the governing bodies of Miami-Dade and Broward Counties each may hold a county-wide referendum in their respective counties on whether to authorize slot machines within existing, licensed parimutuel facilities (thoroughbred and harness racing, greyhound racing, and jai-alai) that have conducted live racing or games in that county during

*USEd to Rig CASino Gambling License*

each of the last two calendar years before the effective date of this amendment. If the voters of such county approve the referendum question by majority vote, slot machines shall be authorized in such parimutuel facilities. If the voters of such county by majority vote disapprove the referendum question, slot machines shall not be so authorized, and the question shall not be presented in another referendum in that county for at least two years.

*Make PAY off to CHARLie CRIST*

(b) In the next regular Legislative session occurring after voter approval of this constitutional amendment, the Legislature shall adopt legislation implementing this section and having an effective date no later than July 1 of the year following voter approval of this amendment. Such legislation shall authorize agency rules for implementation, and may include provisions for the licensure and regulation of slot machines. The Legislature may tax slot machine revenues, and any such taxes must supplement public education funding statewide. *Amend 5, 14*

(c) If any part of this section is held invalid for any reason, the remaining portion or portions shall be severed from the invalid portion and given the fullest possible force and effect.

*NOT SUPREME OVER TREATY OF 1819*

(d) This amendment shall become effective when approved by vote of the electors of the state.

*RATiFied 1821 SPANish Common LAW*
*A "Conduit" "Scheme" For Honest Services*

## Amendment 5

SECTION X. Florida Minimum Wage Amendment *FRAUD, Flipping of*

(a) Public Policy. All working Floridians are entitled to be paid a minimum wage that is sufficient to provide a decent and healthy life for them and their families, that protects their employers from unfair low-wage competition, and that does not force them to rely on taxpayer-funded public services in order to avoid economic hardship. *LAND by NICK GuTiERReZ Jr*

(b) Definitions. As used in this amendment, the terms "Employer," "Employee" and "Wage" shall have the meanings established under the federal Fair Labor Standards Act (FLSA) and its implementing regulations. *RoN MCRAE CHARLie CRIST*

(c) Minimum Wage. Employerss shall pay Employees Wages no less than the Minimum Wage for all hours worked in Florida. Six months after enactment, the Minimum Wage shall be established at an hourly rate of $6.15. On September 30th of that year and on each following September 30th, the state Agency for Workforce Innovation shall calculate an adjusted Minimum Wage rate by increasing the current Minimum Wage rate by the rate of inflation during the twelve months prior to each September 1st using the consumer price index for urban wage earners and clerical workers, CPI-W, or a successor index as calculated by the United States Department of Labor. Each adjusted Minimum Wage rate calculated shall be published and take effect on the following January 1st. For tipped Employees meeting eligibility requirements for the tip credit under the FLSA, Employers may credit towards satisfaction of the Minimum Wage tips up to the amount of the allowable FLSA tip credit in 2003. *For SELF PROFIT, Rigging*

(d) Retaliation Prohibited. It shall be unlawful for an Employer or any other party to discriminate in any manner or take adverse action against any person in retaliation for exercising rights protected under this amendment. Rights protected under this amendment include, but are not limited to, the right to file a complaint or inform any person about any party's alleged noncompliance with this amendment, and the right to inform any person of his or her potential rights under this amendment and to assist him or her in asserting such rights.

*INTERSTATE Commerce*

ISLE OF CAPRI CASINOS INC - ISLE Annual Report (10-K) ITEM 1. BUSINESS.

http://sec.edgar-online.com/2006/07/14/0000863015-06-00006

*[Handwritten annotations: "HENRY M FLAG/GR did NOT PAY 50%", "TO CHARLIE", "WSMS VOID STATUTE"]*

Natchez, Mississippi; Kansas City and Boonville, Missouri; and Bettendorf, Davenport and Marquette, Iowa. We also own a 57% interest in, and receive management fees for operating, two gaming facilities in Black Hawk, Colorado. One of these facilities in Black Hawk, Colorado operates under the name "Isle of Capri" and features our distinctive tropical island theme. Our international gaming interests include a wholly owned casino in Freeport, Grand Bahama, and a two-thirds ownership interest in casinos in Dudley, Wolverhampton, and Walsall, England. We also wholly own and operate a pari-mutuel harness racing facility in Pompano Beach, Florida.

On May 11, 2005, we announced that the Iowa Racing and Gaming Commission awarded us a gaming license in Waterloo, Iowa. Construction is underway on a 35,000 square foot single level casino with 1,300 gaming positions, three restaurants, a 200-room hotel and 1,000 parking spaces. We expect to open in late spring of 2007 at a total cost of approximately $135 million.

On January 4, 2006, a Florida statute became effective allowing Pompano Park and three other pari-mutuel facilities in Broward County to offer slot machine gaming to patrons at these facilities. Although there are pari-mutuel facilities in numerous other counties in the State of Florida, slot machine gaming is only authorized in Broward County where Pompano Park is located. We are constructing a gaming facility including 1,500 slot machines, four restaurants and a feature bar at Pompano Park adjacent to the existing grandstand at a cost approximately $140 million with slot machine gaming anticipated to commence in early calendar year 2007. We do not plan to open a temporary gaming facility. The statute authorizes us to operate up to 1,500 slot machines at Pompano Park 365 days per year, 16 hours per day and requires Pompano Park to pay an annual license fee of $3.0 million and gaming taxes equal to 50% of Pompano Park's net slot machine revenue plus combined county and city taxes of approximately an additional 3.5% on the first $250 million of net slot machine revenue and 5% on net slot machine revenue over $250 million. The Florida Department of Business and Professional Regulation is administering the law and is now implementing rules and regulations for the operation of the slot machines.

On February 14, 2006, we announced the execution of an agreement to sell our properties in Bossier City, Louisiana and Vicksburg, Mississippi to Legends Gaming, LLC for $240 million. We expect to use proceeds from the sale to fund

**The New York Times**
Saturday, September 15, 2007

# Archives

# National News Briefs; Louisiana Ex-Governor Is Indicted Again

Published: September 25, 1999

PRINT

SAVE

SHARE

Former Gov. Edwin W. Edwards and the state insurance commissioner were indicted today by a Federal grand jury on charges stemming from the 1993 failure of an insurance company.

The indictment charges that Mr. Edwards, the commissioner, James H. Brown Jr., and four other people "corrupted the office of the Louisiana insurance commissioner and the state judicial system" to benefit David Disiere, the operator of the Cascade Insurance Company.

The inquiry is the second part of an investigation of Mr. Edwards that produced Federal indictments in November when he and five others were accused of rigging the riverboat casino licensing process. Mr. Edwards has pleaded not guilty.

*[Handwritten annotations:]*

LICENSE PROCESS Rigged by Illegal device OF USING Statute of void ... LICENSE IS NOT NECESSARY Under TREATY of 1819, SPANISH Common Law

LICENSE PROCESS Rigged by CHARLIE CRIST FOR SOLF PROFIT

The United States Attorney's Office
Southern District of Florida
99 N.E. 4 Street
Miami, FL 33132
(305) 961-9000

*[handwritten: WE EXTORT, THREATEN ROB THE PREACHER THEN FLIP THE LAND OIL GAS, LIMESTONE, MINERALS FOR SELF PROFIT]*

October 30, 2006

## FORMER CHAIRMAN OF PALM BEACH COUNTY COMMISSION CHARGED IN FRAUD CONSPIRACY

R. Alexander Acosta, United States Attorney for the Southern District of Florida, Jonathan I. Solomon, Special Agent in

Charge, Federal Bureau of Investigation, Miami Field Office ("FBI"), and Brian J. Wimpling, Special Agent in Charge, Internal Revenue Service, Criminal Investigation Division ("IRS"), announced that defendant, Anthony R. Masilotti, 50, of Wellington, Florida, has been charged in a criminal Information with fraud conspiracy, in violation of Title 18, United States Code, Section 371. The Information also seeks forfeiture of millions of dollars in assets derived from the fraud conspiracy. Masilotti faces a maximum period of five years' incarceration and a $250,000 fine, in addition to the criminal forfeitures.

The Information details Masilotti's misuse of his elected position as a Commissioner on the Palm Beach County Board of County Commissioners ("BCC") to personally enrich himself, his family, and his secret business partners in a series of land deals in Palm Beach, Martin and Brevard Counties, and through his financial relationship with a developer. The Information alleges that, among other things, Masilotti advocated and voted on these matters without disclosing to the BCC and the public his secret financial interest in the transactions, which ultimately netted him millions of dollars.

The Information describes Masilotti's alleged participation in one land deal in Martin County, known as Nine Gems, in which Masilotti had a secret ownership interest. According to the Information, the Nine Gems deal involved the sale of tract of land to the South Florida Water Management District ("SFWMD"), a state agency whose mission is to help protect and manage the region's water supply. In this transaction, Masilotti allegedly misused his official position to advocate and publicly endorse the SFWMD's purchase of the Nine Gems parcel without disclosing his ownership interest in the property to Martin County officials, the SFWMD, the BCC or the public. To hide his ownership interest in the Nine Gems property, Masilotti created a trust in the name of another to purchase the property. After a complicated series of transactions, Masilotti profited $1.7 million from the Nine Gems sale to the SFWMD. He then used the proceeds of the sale to purchase thirteen (13) separate certificates of deposit for $100,000 each, in the names of various family members, to further conceal his interest.

According to the Information, Masilotti was also secretly involved in another land deal in Brevard County. This deal involved a 1,200 acre tract of land owned by Palm Beach Aggregates. Masilotti created another trust, called the ARM Family Land Trust, to purchase 60 acres within the larger 1,200 acre tract for $100,000. Masilotti again misused his official position to advocate and publicly endorse zoning changes dramatically increasing the value of the land, without ever disclosing to Brevard County officials, the BCC or the public his personal financial stake in the deal. After a complicated series of transactions, Masilotti returned the 60 acres to PBA in exchange for beneficial control of nearly 300 acres of land located in Micco, Brevard County, Florida. This swap resulted in Masilotti obtaining control of 300 acres of land worth nearly $8,000,000 for his initial payment of $100,000. *[handwritten: PREACHER EXTORTED]*

A third real estate deal from which Masilotti was allegedly secretly profiting involved the sale of a 50-acre parcel of land in Royal Palm Beach belonging to the Diocese of Palm Beach. Masilotti, who had an undisclosed interest in the group seeking to buy the land, attended numerous meetings in his official capacity with the Diocese, Royal Palm Beach officials, and Palm Beach County Officials, advocating the sale of the Diocese property to a specific buyer. At these meetings, Masilotti concealed his true financial interest in the transaction. The Information alleges that on February 6, 2004, Masilotti received between $40,000 to $50,000 from the sale of the Diocese property in exchange for his assistance to a developer in resolving traffic issues involving the property. The money was wired to a bank account for the Atlantis Hotel and Casino in Nassau, Bahamas.

Finally, the Information alleges that Masilotti, his family and friends received substantial free air travel, valued at more than $100,000, from a developer that did business with the County. During the time he was receiving these gifts, Masilotti

allegedly voted to approve the sale of county-owned real property, known as the "Posse Property," to a group headed by this developer and did not disclose to the BCC and the public that he had received substantial gifts from this developer.

U.S. Attorney Acosta stated, "After six months of hard work, our investigation has yielded results, reflecting the commitment of this Office to identify, investigate and prosecute public corruption, to help ensure that the citizens of South Florida receive the honest services of their elected officials." Acosta added, "As an elected official, former Commissioner Masilotti was legally and ethically required to represent the best interests of his constituents and to perform his duties free from fraud and self-dealing. Masilotti repeatedly breached that duty and misused his power and his office for personal gain."

Jonathan I. Solomon, FBI Special Agent in Charge, stated "For citizens to have confidence in government, they must be confident that their elected officials will not use their position for personal gain. Anthony Masilotti violated this rule. As we have demonstrated today and in the past, the FBI has a firm commitment to the South Florida community to investigate public corruption matters. "

IRS Special Agent in Charge Brian J. Wimpling stated, "The IRS Criminal Investigation Division will continue to utilize whatever resources are necessary to ferret out those individuals who utilize their position of public trust to line their pockets with the proceeds of their illegal activities."

Mr. Acosta commended the investigative efforts of the IRS and FBI. The case is being prosecuted by Assistant United States Attorneys John Kastrenakes, Stephen Carlton, and Antonia Barnes.

A copy of this press release may be found on the website of the United States Attorney's Office for the Southern District of Florida at www.usdoj.gov/usao/fls . Related court documents and information may be found on the website of the District Court for the Southern District of Florida at http://www.flsd.uscourts.gov/ or on http://pacer.flsd.uscourts.gov/ .

FBI Home Page          Miami Home Page          Miami Press Releases



# GAMBLING AND POLITICAL CORRUPTION

An NCALG White Paper
by Dr. Guy C. Clark
Chairman, NCALG/NCAGE

**Quick Find:**

NCALG Home

Addiction

Bankruptcy

Crime

Beginners' Brochure

Conference Reports

Gambling & Government

Internet Gambling

Links

Lotteries

Quick Facts

Youth

ncalg

Contribute

The corrupting effects of gambling on politics take two forms. Reported, legal campaign contributions on both the state and national level amounted to tens of millions of dollars last year. Many previous anti-gambling candidates changed their votes when faced by opponents who were being heavily funded by gambling interests. Illegal, under-the-table bribes from the gambling industry are harder to corroborate, but are probably also in the tens of millions. Both form a corrupting influence on our political system of major proportions and help to promote the gambling agenda.

## CAMPAIGN CONTRIBUTIONS

The Center for Responsive Politics reported that the gambling "industry" in 1999 gave $448,700 to the National Republican Congressional Committee and $847,341 to the Democratic Congressional Campaign Committee. According to the article, *Paying the Price* in Common Cause, "PAC and soft money contributions from the industry have grown from $2.3 million in 1993-94 to more than $5.6 million in 1997-98. Soft money contributions account for much of this growth, increasing from just under $2 million in 1993-94 to $4.7 million in 1997-98."

In Illinois, The Sunshine Project, a campaign watchdog organization, found that the gambling "industry" had contributed $1.7 million to state and local politicians in 1995 and 1996. During that time, 123 legislators received at least $500 in contributions. House Minority Leader Lee Daniels received the largest single amount, and the House Republican Campaign Committee received $334,000.[1]

In California, one card club alone spent nearly $2 million in the last five years on contributions and lobbying at the state level. The Mashantucket Pequot Indian tribe, which operates the Foxwoods Resort Casino in Connecticut, has spent more than $1 million on federal soft money donations since 1993. In the 1994 casino legalization battle in Florida, casino interests spent $16 million. In 1996, Arkansas gambling interests spent $6 million and Ohio spent $9 million in campaign contributions.[2]

The two eastern Connecticut tribes, owners of the Mohegan Sun and Foxwoods resorts, contributed a total of $60,000 in October, 2001 to Democratic and Republican national political organizations.[3]

The connection between the political contributions and the vote is easy to follow in most cases, but New Mexico provides a startling case in point. In the 1996 election season, the tribal casinos contributed about $340,000 to State Senators and Representatives running for office. Articles by reporter Tina Griego in the Albuquerque Tribune titled "New Mexico's Big Gamble" showed that 44 legislators received over $2,000 apiece, the largest contribution being over $46,000, received by Senate pro tempore president Manny Aragon. Only two of those 44 legislators voted against the tribal compacts. That's a high return on the investment.

## BRIBERY AND EXTORTION BY GAMBLING INTERESTS

In testimony before the National Gambling Impact Study Commission, former Illinois Senator Paul Simon stated that...gambling "...has more of a history of corruption than any other industry." Public officials in state after state have been indicted and convicted in gambling related illegal activity. An alleged Youngstown mob boss put at least $10,000 into the 1996 election campaign of the Mahoning County sheriff in an effort to protect illegal gambling businesses.[4]

From Ohio, "FBI affidavits unsealed Tuesday are loaded with names of local judges, police officers, sheriffs, union leaders, politicians and businessmen who are alleged to be members of or under the control of the local faction of the Pittsburgh Mafia...relating to mob-controlled illegal gambling businesses and other forms of public corruption."[5]

In Florida, Bo Johnson, ex-speaker of the House of Representatives, was charged with seven criminal counts involving extortion and bribery, the largest of which he received from a casino company, and could be sentenced to up to 40 years in prison and be fined up to $1 million if convicted on all counts.[6]

Representative John Leopold of Maryland stated, "The Senate Majority Leader from West

County was offered a $10,000 bribe to vote for that (slot machine) bill. Another legislator, a State Senator from my county, was also offered $5,000 in cash in an envelope outside the Senate chamber." [7]

Nineteen Arizona legislators and lobbyists were caught on videotape, with the legislators promising to vote for gambling bills after receiving cash from the lobbyists. [8] One legislator was convicted of conspiracy, and six ultimately accepted plea bargains. [9]

In Missouri, the House Speaker of 15 years resigned in 1996 after a federal investigation produced charges of gambling-related deals. As reported in newspaper accounts, the ex-speaker demanded that a gambling company funnel payments of $16 million to the ex-speaker's business associates and friends in order to obtain a state casino license. [10]

In South Carolina, Rep. Paul Derrick took $1,000 for his vote on a pari-mutuel betting bill, Assistant U.S. Attorney Robert Meyer told jurors today at Derrick's retrial in the Operation Lost Trust investigation. Derrick was "caught red-handed on videotape, taking a bribe for his vote," Assistant U.S. Attorney Robert Meyer said.  Derrick was "part of a core group of legislators in the House of Representatives who were ready to sell their votes and their support for cash," according to Meyer. [11] Seventeen South Carolina lawmakers had previously been convicted of or pled guilty to similar charges in 1992. [12]

In Kentucky, Operation Bobtrot, an investigation into bribery surrounding the state's horse racing industry, resulted in the conviction or plea-bargaining of 15 state legislators. [13]

Louisiana seems to top the lot with blatant corruption at all levels of government.  More than a dozen state legislators were investigated on bribery charges in a two-year FBI operation. [14] Gambling board member Ecotry Fuller was indicted by a federal grand jury Wednesday on 12 felony counts of mail fraud, wire fraud, perjury and conspiracy. [15]  After escaping felony convictions in several previous corruption trials, ex-governor Edwin Edwards was convicted on May 8, 2000 for the first time, "on charges he extorted hundreds of thousands of dollars from businessmen applying for riverboat casino licenses." [16]

The expansion that has occurred in legalized gambling across the U.S. in the past few decades has not been a result of a popular demand for more gambling.  The expansion has occurred because the gambling "industry" pays state legislators, governors and other public officials for their votes, either with campaign contributions or by bribery and extortion.  The gambling "industry" has pushed and pushed government at all levels, and passes out the money to buy friends and supporters.  The gambling industry owns several state legislatures, and is an enormously corrupting influence in dozens of others.  The U.S. Congress is becoming more and more susceptible to the enticements offered by the gambling industry.

[1] Dave McKinney, March 17, 2001 *Illinois sun-times*

[2] "Heavy Betting Nation-wide Gambling Political Contributions: a Mother Jones special investigation" June 9, 1999

[3] *Connecticut Post*. Tuesday, December 04, 2001.

[4] *Plain Dealer* December 17, 1997

[5] *Tribune Chronicle*, Warren, Ohio Jan 10, 1998

[6] By Mike Oliver "Ex-speaker, wife to surrender today", *The Orlando Sentinel*, January 22, 1998

[7] John Leopold, Maryland State Representative, before National Gambling Impact Study Commission, August 20, 1997

[8] Sally Ann Stewart, "New Tarnish on Arizona's Image; Bribe Case Has State 'in Shock,'" *USA Today*, February 13, 1991, p. 6a.

[9] John Pacenti, "Walker Found Guilty of Conspiracy in AzScam," Associated Press, November 5, 1992

[10] Joe Stephens, "Powerbrokers Await Windup of Grand Jury," Kansas *City Star*, October 11, 1996, p. A1

[11] Bruce Smith AP in *The State*, May 25, 1999

[12] "Former State Representative Sentenced to Prison for Selling Votes," Associated Press, April 24, 1992.

[13] Bill Estep, "BOBTROT Leaves Legacy of Ethics Rules," *Lexington Herald-Leader*, August 2, 1995

[14] Jim Yardley, "Don't Bet on Gambling; Louisiana Bribery Suspected," *Atlanta Journal and Constitution*, September 5, 1995

[15] "Indictment casts pall over gambling", *The Advocate*, 8/6/99

[16] Natalie Gott, "Former four-term Louisiana governor convicted of racketeering," Associated *Press*, May 9, 2000,

**To Contact NCALG**, email ncalg@ncalg.org or call us at
the **National Information Center 1-800-664-2680**
100 Maryland Avenue NE, Room 311, Washington, DC, 20002

orange terra-cotta
me, adding a final
n.
e de Leon was only
ions and alterations
the way from the
e Alcazar, a smaller
commodations for
r also contained an
the rear there was
. The Casino con-
ral types of thera-
bowling alley and
re and Hastings'
a fitting comple-

of the moment by
rdova Street from
at medieval Moor-
he Ponce de Leon
side was a large,
winter chills were
he hotel, however,
old out to Flagler,
added it to his

which were, after
ler purchased the
he St. Johns River
nnect with the rail
uld step out of the
Pullman "palace"
e warm sunshine
oad station in St.
spring overnight
north and set the

hotels in brightly





The Spanish Renaissance Hotel Ponce de Leon (top) was the first
built by Henry M. Flagler, opening in 1888. A year later, across King
Street, the Alcazar (lower right) welcomed guests. The Cordova, of
Moorish _architecture (lower left) completed the luxurious
triumvirate.

HOW HENRY M. FLAGLER
did iT

*[handwritten: INDIANS PAY NO IRS TAXES BY TREATY "1794" THAT INCLUDES PEOPLE OF EVERY]*

Treaty, that is to say; His Brittanick Majesty has named for His Plenipotentiary, *[handwritten: DEGREE]* The Right Honourable William Wyndham Baron Grenville of Wotton, One of His Majesty's Privy Council, and His Majesty's Principal Secretary of State for Foreign Affairs; and The President of the said United States, by and with the advice and Consent of the Senate thereof, hath appointed for Their Plenipotentiary The Honourable John Jay, Chief Justice of the said United States and Their Envoy Extraordinary to His Majesty, who have agreed on, and concluded the following Articles

*[handwritten: FIRST 10 ARTICLES SHALL]*

**ARTICLE 1.** *[handwritten: BE PERMANENT TREATY RATIFIED SUPREME LAW under ARTICLE VI]*

There shall be a firm inviolable and universal Peace, and a true and sincere Friendship between His Britannick Majesty, His Heirs and Successors, and the United States of America; and between their respective Countries, Territories, Cities, Towns and People of every Degree, without Exception of Persons or Places.

**ARTICLE 2.** *[handwritten: NO ZONING BOUNDARY 60'S TO FOR INDIANS EAST FLORIDA under TREATY EXISTS]*

His Majesty will withdraw all His Troops and Garrisons from all Posts and *[handwritten: of]* Places within the Boundary Lines assigned by the <u>Treaty of Peace</u> to the United *[handwritten: 1783]* States: This Evacuation shall take place on or before the first Day of June One *[handwritten: 1794]* thousand seven hundred and ninety six, and all the proper Measures shall in the interval be taken by concert between the Government of the United States, and His Majesty's Governor General in America, for settling the previous arrangements which may be necessary respecting the delivery of the said Posts: The United States in the mean Time at Their discretion extending their settlements to any part within the said boundary line, except within the precincts or Jurisdiction of any of the said Posts. All <u>Settlers and Traders, within the Precincts or Jurisdiction of the said Posts, shall continue to enjoy, unmolested, all their property of every kind,</u> and shall be protected therein. They shall be at full liberty to remain there, or to remove with all or any part of their Effects; and it shall also be free to them to sell their Lands, Houses, or Effects, or to retain the property thereof, at their discretion; such of them as shall continue to reside within the said Boundary Lines shall not be compelled to become Citizens of the United States, or to take any Oath of allegiance to the Government thereof, but they shall be at full liberty so to do, if they think proper, and they shall make and declare their Election within one year after the Evacuation aforesaid. And all persons who shall continue there after the expiration of the said year, without having declared their intention of remaining Subjects of His Britannick Majesty, shall be considered as having elected to become Citizens of the United States.

*[handwritten: UNMOLESTED USE & CASINO GAMBLING CONTRACT]*

ART. II—EXECUTIVE DEPARTMENT                    473

rency for the payment of debts and to confound creditors who would not accept the currency provided that Virginia citizens could pay into the state treasury debts owed by them to subjects of Great Britain, which money was to be used to prosecute the war, and that the auditor would give the debtor a certificate of payment which would discharge the debtor of all future obligations to the creditor.[274] The Virginia scheme directly contradicted the assurances in the peace treaty that no bars to collection by British creditors would be raised, and in *Ware v. Hylton*[275] the Court struck down the state law as violative of the treaty that Article VI, paragraph 2, made superior. Said Justice Chase: "A treaty cannot be the *Supreme law* of the land, that is of all the *United States*, if any act of a *State Legislature* can stand in its way. If the constitution of a State . . . must give way to a treaty, and fall before it; can it be questioned, whether the *less* power, an act of the state legislature, must not be prostrate? It is the declared will of *the people* of the *United States* that every treaty made, by the authority of the *United States* shall be superior to the *Constitution* and *laws* of *any individual State*; and their will alone is to decide."[276]

In *Hopkirk v. Bell*,[277] the Court further held that this same treaty provision prevented the operation of a Virginia statute of limitation to bar collection of antecedent debts. In numerous subsequent cases, the Court invariably ruled that treaty provisions superseded inconsistent state laws governing the right of aliens to inherit real estate.[278] Such a case was *Hauenstein v. Lynham*,[279] in which the Court upheld the right of a citizen of the Swiss Republic, under the treaty of 1850 with that country, to recover the estate of a relative dying intestate in Virginia, to sell the same, and to export the proceeds of the sale.[280]

---

[274] 9 W. HENING, STATUTES OF VIRGINIA (Richmond: 1821), 377–380.

[275] 3 Dall. (3 U.S.) 199 (1796).

[276] Id., 236–237 (emphasis by Court).

[277] 3 Cr. (7 U.S.) 454 (1806).

[278] See the discussion and cases cited in Hauenstein v. Lynham, 100 U.S. 483, 489–490 (1880).

[279] 100 U.S. 483 (1880). In Kolovrat v. Oregon, 366 U.S. 187, 197–198 (1961), the International Monetary Fund (Bretton Woods) Agreement of 1945, to which the United States and Yugoslavia were parties, and an Agreement of 1948 between these two nations, coupled with continued American observance of an 1881 treaty granting reciprocal rights of inheritance to Yugoslavian and American nations, were held to preclude Oregon from denying Yugoslavian aliens their treaty rights because of a fear that Yugoslavian currency laws implementing such Agreements prevented American nationals from withdrawing the proceeds from the sale of property inherited in the latter country.

[280] See also Geofroy v. Riggs, 133 U.S. 258 (1890); Sullivan v. Kidd, 254 U.S. 433 (1921); Nielsen v. Johnson, 279 U.S. 47 (1929); Kolovrat v. Oregon, 366 U.S. 187 (1961). But a right under treaty to acquire and dispose of property does not except aliens from the operation of a state statute prohibiting conveyances of home-

there are a few cases which hold to the contrary.[17] But, whether it applies to acts of the territorial government is a more difficult question. It has been held that the territories of Missouri and Kansas had no right to impair the obligations of contracts.[18] Of course, the provision has no application to foreign governments, and effect must be given to their laws in the enforcement of contracts in this jurisdiction which are governed by foreign laws, even though such laws impair the obligations of contracts,[19] but it is well settled that it does apply to municipal corporations which are mere agencies or arms of the state government.[20]

**§ 2717. Laws affected by this constitutional provision.** —The clause of the federal constitution forbidding any state to pass any law impairing the obligation of contracts embraces acts of the state legislature,[21] and also applies to city ordinances[22] when such ordinances are enacted by authority of the state.[23] And orders and resolutions of a city

[17] ed. 657; Herman v. Phalen, 14 How. (U. S.) 79, 14 L. ed. 334.

[18] Territory v. Reyburn, McCahon (Kans.) 134, 1 Kans. (Dass. Ed.) 551; Baird v. United States, Dev. Ct. Cl. (U. S.) 89, § 333.

[19] Morton v. Sharkey, 1 Kans. 535 (Dass. ed.), McCahon (Kans.) 113; Ruggles v. Washington County, 3 Mo. 496.

[20] Canada Southern R. Co. v. Gebhard, 109 U. S. 527, 27 L. ed. 1020, 3 Sup. Ct. 363.

[21] Iron Mountain R. Co. v. Memphis, 96 Fed. 113, 37 C. C. A. 410; Mercantile Trust & Deposit Co. v. Collins Park & B. R. Co., 99 Fed. 812; Southwest Missouri Light Co. v. Joplin, 101 Fed. 23; Grand Trunk &c. R. Co. v. South Bend (U. S.), 33 Sup. Ct. 303, and numerous cases there cited in the opinion; Neill v. Gates, 152 Mo. 585, 54 S. W. 460.

[22] Louisiana v. Pilsbury, 105 U. S. 278, 26 L. ed. 1090; Chicago Ins. Co. v. Needles, 113 U. S. 574, 28 L. ed. 1084, 5 Sup. Ct. 681; Mobile, O. R. Co. v. Tennessee, 153 U. S. 486, 38 L. ed. 793, 14 Sup. Ct. 968; Beers v. Haughton, 1 McLean (U. S.) 226,

Fed. Cas. No. 1230; National Bank of Western Arkansas v. Sebastian County, 5 Dill. (U. S.) 414, Fed. Cas. No. 10040. The Workmen's Compensation Law of New York was held not authorized by the reserved power of the state to amend or alter corporate charters. Ives v. South Buffalo R. Co., 201 N. Y. 271, 94 N. E. 431, 34 L. R. A. (N. S.) 162n, affg. 140 App. Div. (N. Y.) 921, 125 N. Y. S. 1125, affg. 68 Misc. (N. Y.) 643, 124 N. Y. S. 920.

[23] Iron Mountain R. Co. v. Memphis, 96 Fed. 113, 37 C. C. A. 410; Mercantile Trust & Deposit Co. v. Collins Park & B. R. Co., 99 Fed. 812; Southwest Missouri Light Co. v. Joplin, 101 Fed. 23; Cumberland Tel. & T. Co. v. Memphis, 198 Fed. 955; Neill v. Gates, 152 Mo. 585, 54 S. W. 460; Penn Mut. Life Ins. Co. v. Austin, 168 U. S. 685, 42 L. ed. 626, 18 Sup. Ct. 223. Ordinances of a city are laws of the state within the meaning of this provision of the Constitution. See also, Grand &c. R. Co. v. South Bend (U. S.), 33 Sup. Ct. 303 and cases cited.

[24] And if a contract is alleged to

NO ZONING CAN EVER EXIST
BY VOID, WSMJ JUDGES ORDER

Case 1:07-cv-02203-RMC    Document 1-4    Filed 12/06/2007    Page 33 of 34

CHAP. XXXIX.—*An Act for carrying into execution the treaty between the United States and Spain, concluded at Washington on the twenty-second day of February, one thousand eight hundred and nineteen.*

*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That the President of the ...

[handwritten marginalia:]
TREATY
1819
RATIFIED
TREATY
1821
CASINO
GAMBLING
+
UNRESTRICTED
USE OF
PROPERTY

SPANISH LAW
IS THE COMMON   7 PETERS 51
LAW OF FLORIDA PROPERTY

Case 1:07-cv-02203-RMC    Document 1-4    Filed 12/06/2007    Page 34 of 34

of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution; and in the mean time, shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction.

*[handwritten: TXSATY 1803]*
*[handwritten: TROATY 1821]*
*[handwritten: TROATY 1853]*

### ARTICLE X.

[Stricken out.]

### ARTICLE XI.

*[handwritten: TROATY 1848]*
*[handwritten: TROATY 1794]*

Considering that a great part of the territories, which, by the present treaty, are to be comprehended for the future within the limits of the United States, is now occupied by savage tribes, who will hereafter be under the exclusive control of the Government of the United States, and whose incursions within the territory of Mexico would be prejudicial in the extreme, it is solemnly agreed that all such incursions shall be forcibly restrained by the Government of the United States whensoever this may be necessary; and that when they cannot be prevented, they shall be punished by the said government, and satisfaction for the same shall be exacted—all in the same way, and with equal diligence and energy, as if the same incursions were meditated or committed within its own territory, against its own citizens.

It shall not be lawful, under any pretext whatever, for any inhabitant of the United States to purchase or acquire any Mexican, or any foreigner residing in Mexico, who may have been captured by Indians inhabiting the territory of either of the two republics; nor to purchase or acquire horses, mules, cattle, or property of any kind, stolen within Mexican territory by such Indians.

And in the event of any person or persons, captured within Mexican territory by Indians, being carried into the territory of the United States, the Government of the latter engages and binds itself, in the most solemn manner, so soon as it shall know of such captives being within its territory, and shall be able so to do, through the faithful exercise of its influence and power, to rescue them and return them to their country, or deliver them to the agent or representative of the Mexican Government. The Mexican authorities will, as far as practicable, give to the Government of the United States notice of such captures; and its agents shall pay the expenses incurred in the maintenance and transmission of the rescued captives; who, in the mean time, shall be treated with the utmost hospitality by the American authorities at the place where they may be. But if the Government of the United States, before receiving such notice from Mexico, should obtain intelligence, through any other channel, of the existence of Mexican captives within its territory, it will proceed forthwith to effect their release and delivery to the Mexican agent, as above stipulated.

For the purpose of giving to these stipulations the fullest possible efficacy, thereby affording the security and redress demanded by their true spirit and intent, the Government of the United States will now and hereafter pass, without unnecessary delay, and always vigilantly enforce, such laws as the nature of the subject may require. And, finally, the sacredness of this obligation shall never be lost sight of by the said Government, when pro-

*[handwritten: UNRESTRICTED USE + CASINO GAMBLING TREATY 1848 CONTRACT]*

07-2203

RMC

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| George May   88888 | The State of Florida Et. al. |
| Palm Bch. | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Leon |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | |
|---|---|
| George May,   Ph. 305-508-5011 P.O. Box 32247 Palm Bch. Gardens Fl. 33420 | Case: 1:07-cv-02203 Assigned to : Collyer, Rosemary M. Assign. Date : 12/6/2007 Description: Pro Se General Civil |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
⊗ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ⊗ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⊗ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ⊗ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| 410 Antitrust | 310 Airplane 315 Airplane Product Liability 320 Assault, Libel & Slander 330 Federal Employers Liability 340 Marine 345 Marine Product Liability 350 Motor Vehicle 355 Motor Vehicle Product Liability 360 Other Personal Injury 362 Medical Malpractice 365 Product Liability 368 Asbestos Product Liability | 151 Medicare Act **Social Security:** 861 HIA ((1395ff) 862 Black Lung (923) 863 DIWC/DIWW (405(g) 864 SSID Title XVI 865 RSI (405(g) **Other Statutes** 891 Agricultural Acts 892 Economic Stabilization Act 893 Environmental Matters 894 Energy Allocation Act 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ⊗ F. Pro Se General Civil |
|---|---|---|

| **Real Property** 210 Land Condemnation 220 Foreclosure 230 Rent, Lease & Ejectment 240 Torts to Land 245 Tort Product Liability 290 All Other Real Property **Personal Property** 370 Other Fraud 371 Truth in Lending 380 Other Personal Property Damage 385 Property Damage Product Liability | **Bankruptcy** 422 Appeal 28 USC 158 423 Withdrawal 28 USC 157 **Prisoner Petitions** 535 Death Penalty 540 Mandamus & Other 550 Civil Rights 555 Prison Condition **Property Rights** 820 Copyrights 830 Patent 840 Trademark **Federal Tax Suits** 870 Taxes (US plaintiff or defendant 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** 610 Agriculture 620 Other Food &Drug 625 Drug Related Seizure of Property 21 USC 881 630 Liquor Laws 640 RR & Truck 650 Airline Regs 660 Occupational Safety/Health 690 Other **Other Statutes** 400 State Reapportionment 430 Banks & Banking 450 Commerce/ICC Rates/etc. 460 Deportation | 470 Racketeer Influenced & Corrupt Organizations 480 Consumer Credit 490 Cable/Satellite TV 810 Selective Service 850 Securities/Commodities/ Exchange 875 Customer Challenge 12 USC 3410 900 Appeal of fee determination under equal access to Justice 950 Constitutionality of State Statutes ⊗ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

/10

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting & Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-Employment<br>446 Americans w/Disabilities-Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

Ⓧ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Defendant's are violating plaintiff's Constitutional, Civil Rights.

**VII. REQUESTED IN COMPLAINT** — CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** 75,000.00    Check YES only if demanded in complaint
**JURY DEMAND:** YES ___ NO Ⓧ

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES Ⓧ NO ___ If yes, please complete related case form.

DATE 4-27-07 / 12.6.07    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.